# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 29, 2008

Charles R. Fulbruge III
Clerk

No. 06-30908

INDIANA ELECTRICAL WORKERS' PENSION TRUST FUND IBEW;
PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 630 PENSION-
ANNUITY TRUST FUND; CARPENTERS PENSION FUND, of Baltimore,
Maryland; HAWAII LABORERS PENSION PLAN

Plaintiffs – Appellees

v.

SHAW GROUP INC; TIM BARFIELD, JR; J M BERNHARD, JR;
RICHARD F GILL; ROBERT BELK

Defendants – Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, and STEWART, and CLEMENT, Circuit Judges.

EDITH H. JONES, Chief Judge:

A putative class of purchasers of Shaw Group, Inc. ("Shaw") common stock sued Shaw and four of its corporate officers alleging that Shaw engaged in a scheme to misrepresent the true nature of the company's financial condition to the public and inflate its stock price. Shaw moved to dismiss for failure to satisfy the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading requirements for securities fraud cases, but the district court denied the motion without a written opinion. On this interlocutory appeal, we hold that the complaint failed to allege facts from which a "strong inference of scienter"

may be drawn against the defendants. We reverse and remand with instructions to dismiss the case.

BACKGROUND

Shaw, which is headquartered in Baton Rouge, Louisiana, provides engineering, design and construction services to the energy, chemical and environmental industries, as well as federal, state and local governments. On June 10, 2004, Shaw issued a press release announcing that the Securities and Exchange Commission ("SEC") was conducting an informal inquiry concerning the company, which appeared to relate to the company's use of the purchase method of accounting for acquisitions. When the stock price fell on this notice, several class action suits were filed. Union pension funds have become the lead plaintiffs in the consolidated class action against defendants Shaw and its CEO J. M. Bernhard, Jr., CFO Robert Belk, COO Tim Barfield and former COO Richard Gill.[1] The class period runs from October 19, 2000, to June 10, 2004.

Pleading violations of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 securities fraud, and Section 20(a) control person liability, the lengthy complaint alleges that Shaw knowingly or with severe recklessness misled the public in five ways. See 15 U.S.C. § 78j(b); 17 C.F.R § 240.10b-5; 15 U.S.C. § 78t(a). First, Shaw artificially inflated its earnings by manipulating the purchase method of accounting in connection with two acquisitions. Second,

---

[1] At oral argument, plaintiffs conceded that Barfield and Gill should be dismissed as defendants. Therefore, we do not examine the allegations against them. The allegations against Barfield and Gill appear to rely on the "group pleading doctrine," a judicial presumption that statements in group-published documents are attributable to those individuals with direct involvement in the everyday business of the company, which this court has rejected. See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363-65 (5th Cir. 2004).

Shaw prematurely recognized revenue on long-term engineering, procurement and construction contracts by exploiting the percentage of completion method of accounting in violation of generally accepted accounting principles ("GAAP"). Third, Shaw failed to disclose material issues affecting the viability of a major construction project. Fourth, the company overstated its backlog of contracts to give a false impression that demand for its services was higher than it actually was. Fifth, Shaw delayed paying vendors or did not pay them at all as a device to improve its reported cash flow.

Plaintiffs allege that the true nature of Shaw's financial condition leaked to the stock market in a series of four disclosures beginning with the August 2002 announcement that a customer had failed to make a $32 million milestone payment for work performed on a construction project, and continuing with negative disclosures about the company's earnings and operational performance.[2] The stock price dropped allegedly in response to each of these events and to the final straw, the announcement of the SEC inquiry.

Curiously, given the dramatic nature of the allegations and the claims that the company overstated assets by "hundreds of millions of dollars," the company never restated its earnings or financial reports based on the matters alleged by plaintiffs; has not received a qualified audit report; has not reported that it was the victim of any accounting irregularities; and has endured no liquidity crisis, as might have been expected if massive accounting fraud had occurred. Finally, we take judicial notice that the SEC terminated its inquiry against Shaw on December 28, 2007, with no enforcement recommendation.

---

[2] Shaw announced (1) negative financials and revised estimates on July 11, 2003, (2) a downturn in earnings on October 16, 2003, and (3) a disappointing operational performance on January 14, 2004.

The district court denied Shaw's motion to dismiss for failure to satisfy Federal Rule of Civil Procedure 12(b)(6) in light of the PSLRA's heightened securities fraud pleading requirements. The court heard oral argument and ruled from the bench with no written or orally stated opinion. This court granted an interlocutory appeal. Shaw challenges the sufficiency of plaintiffs' pleading of falsity, scienter and loss causation.

## DISCUSSION

The PSLRA set high standards for pursuing federal securities fraud suits in order to check "frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." Tellabs, Inc. v Makor Issues & Rights, Ltd., - - - U.S. - - -, 127 S. Ct. 2499, 2509 (2007). To be sure, the elements of a fraud claim have stayed the same: a material misrepresentation or omission; a defendant with scienter concerning the fraud; reliance; damages; and loss causation. See Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 264 n.5 (5th Cir. 2007) (citing Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627 (2005)). But the PSLRA enhanced the particularity requirements for pleading fraud under Federal Rule of Civil Procedure 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1)(B). Second, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

In this case, we pretermit testing the sufficiency of the allegations of falsity and loss causation because the complaint insufficiently alleges that the

defendants acted with scienter. We review the sufficiency of the complaint de novo on appeal. See Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 550 (5th Cir. 2007) [hereinafter Central Laborers].

Tellabs affirmed a three step approach to reviewing scienter allegations on a motion to dismiss a federal securities fraud case pursuant to the PSLRA. Tellabs, 127 S. Ct. at 2509-10. First, the allegations must, as in federal pleadings generally, be taken as true. Id. at 2509. Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. Id. The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled. Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. Id. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible." Id. at 2510.

Before Tellabs, this court had elaborated on the basis for scienter allegations. The required state of mind is an "intent to deceive, manipulate, or defraud" or "severe recklessness." Rosenzweig v. Azurix Corp., 332 F.3d 854, 866 (5th Cir. 2003) (internal quotation marks omitted). Severe recklessness is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id. at 866 (quoting Nathenson v. Zonagen Inc., 267 F.3d 400, 408 (5th Cir. 2001)). Although circumstantial evidence can support a strong inference of scienter, Abrams v. Baker Hughes Inc., 292 F.3d 424, 430 (5th Cir. 2002), allegations of motive and opportunity standing alone will not suffice.

Rosenzweig, 332 F.3d at 867. Appropriate motive and opportunity allegations may, however, "meaningfully enhance the strength of the inference of scienter." Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 368 (5th Cir. 2004) (quoting Nathenson, 267 F.3d at 412). Finally, this court has rejected the group pleading approach to scienter and instead looks to the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." Id. at 366. Consequently, "it is only necessary for us to address the allegations claimed to adequately show [scienter] on the part of the [named officers]" to determine whether the complaint sufficiently pleads scienter. Id. at 367.

With this landscape in mind, we turn to examine the scienter allegations pertinent to each category of alleged misstatements and then to the attempted motive and opportunity bolstering allegations against Bernhard and Belk.

A.     Accounting Irregularities

The vast bulk of allegations in a very bulky complaint relate to Shaw's alleged abuse of or failure to follow GAAP. The accounting irregularities are of two types: those relating to the way in which Shaw treated its acquisition of two large companies from bankruptcy proceedings; and those relating to the percentage of completion method of recognizing revenue from Shaw's performance of long-term contracts. Plaintiffs' bottom line assertion is that these irregularities allowed Shaw artifically to inflate its earnings by "hundreds of millions" of dollars during the class period. This court follows the general

rule[3] and has stated repeatedly that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 264 (5th Cir.), modified and reh'g denied, 409 F.3d 653 (5th Cir. 2005) (quoting Fine v. Am. Solar King Corp., 919 F.2d 290, 297 (5th Cir. 1990)); see also Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 290 (5th Cir. 2006) ("[F]ailure to follow accounting standards, without more, does not establish scienter.").

To plead scienter adequately, plaintiffs must state with particularity facts giving rise to a strong inference that the "party [knew] that it [was] publishing materially false information, or the party [was] severely reckless in publishing such information." Barrie, 397 F.3d at 264 (quoting Fine, 919 F.2d at 297).

1. Acquisition Accounting

Plaintiffs allege that Shaw misused the purchase method of accounting for the acquisitions of the assets of two large companies, Stone & Webster and the IT Group, out of their respective bankruptcy proceedings in July 2000 and May 2002. Shaw portrayed the acquisitions as critical to consolidating the company's market position and to its diversification efforts. Shaw fully disclosed its

---

[3] See, e.g., Ferris, Baker Watts, Inc. v. Ernst & Young, LLP, 395 F.3d 851, 855 (8th Cir. 2005) ("Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."); Pirraglia v. Novell, Inc., 339 F.3d 1182, 1191 (10th Cir. 2003) ("Claims of accounting irregularities or violations of [GAAP] support a claim of scienter only when coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors." (internal quotation marks omitted); Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1208 (11th Cir. 2001) ("[A]llegations of violations of GAAS or GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)."); In re Comshare Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999) ("The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."); Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.").

application of the relevant accounting principles. The plaintiffs assert, however, that Shaw artifically inflated the recorded reserves and goodwill associated with the purchase method and thereafter used such accounts to "pad" Shaw's earnings. Shaw also established reserves for pending contracts acquired from these companies that, according to the plaintiffs, "bore no reasonable relationship to the fair market value of the acquired assets," and were used as "cookie jar" reserves to inflate its reported earnings. Plaintiffs finally allege irregularities in Shaw's accounting for adjustments to the fair value of the acquired assets; its failure to disclose the basis for pre-acquisition contingencies bearing on such adjustments; and its failure to write off impaired goodwill. (Plaintiffs' Consolidated Amended Complaint ("Compl.") ¶ 98.) All of these allegations are tied to the statements in Shaw's periodic financial reports during the class period, and voluminous citations to accounting rules are included.

No direct allegations of fraudulent conduct or intent on the part of Bernhard or Belk are alleged. Instead, plaintiffs rely, as they are permitted to do, on circumstantial allegations. They assert that the individual defendants must have known of the irregularities because of their executive positions in the company, and they emphasize Bernhard's "hands-on management style," and the magnitude and extent of the accounting standards violations. None of these assertions withstands analysis. First, this court's caselaw makes clear that "pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." Abrams, 292 F.3d at 432.[4] Second, Bernhard's management style, coupled with

---

[4] See also Blackwell, 440 F.3d at 287 ("Corporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."); Nathenson, 267 F.3d at 424-25 ("We recognize that normally an officer's position

his alleged boast that "there is nothing in this company that I don't know," are insufficient to support a strong inference of scienter. See Goldstein v. MCI WorldCom, 340 F.3d 238, 251 (5th Cir. 2003). Such statements lack specificity about what Bernhard may have known or, for that matter, was reckless not to have known, about the details of the company's accounting practices. That these allegations derive from confidential sources further detracts from their weight in the scienter analysis. Following Tellabs, courts must discount allegations from confidential sources. Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 756-57 (7th Cir. 2007). Such sources afford no basis for drawing the plausible competing inferences required by Tellabs. Id. at 757 ("Tellabs requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences; anonymity frustrates that process."). At the very least, such sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded . . . ." ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 353 (5th Cir. 2002); see also Central Laborers, 497 F.3d at 552 (same).

The final assertion, that Bernhard, Belk and through them, Shaw must have known of the alleged accounting irregularities because they are so massive, disproves itself. This case is quite unlike most securities fraud cases, which are precipitated when the company announces such revelations as a restatement in earnings due to accounting mistakes or the discovery and correction of material errors or misdeeds in a subsidiary. Here, there was no mea culpa from the company in the form of acknowledged wrongdoing or restated financial reports,

---

with a company does not suffice to create an inference of scienter.").

nor was there any auditor qualification to those aspects of the reports made the basis of this complaint, nor any publicly expressed reservations by the auditors to the financials. There is no single event or fact that the executives can be alleged to have known and concealed from the public. In Central Laborers, by contrast, the company disclosed material weaknesses in its internal controls that eventually required restatement of two and a half fiscal years of financial results. 497 F.3d at 549. This court concluded that the defendant's "public statements and subsequent restatement due to GAAP violations provide[d] some basis to infer scienter." Id. at 552. But that is lacking here.

Moreover, while plaintiffs strenuously argue that the "cookie jar" reserves and other devices enabled Shaw to pad its earnings massively, they make no attempt to estimate by how much the earnings were inflated. There is no standard of comparison to what the correct numbers would have been. Valuations of assets, especially contracts and assets acquired from bankrupt companies, as well as the application of sophisticated accounting standards like "fair value," leave broad scope for judgment and informed estimation; this is another way of saying that determinations on such matters can differ reasonably and sizably. See Greebel v. FTP Software, Inc., 194 F.3d 185, 205 (1st Cir. 1999) ("'Generally accepted accounting principles' . . . tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." (quoting Thor Power Tool Co. v. Comm'r of Internal Revenue, 439 U.S. 522, 544, 99 S. Ct. 773, 787 (1979)). Plaintiffs cannot transform inherently nuanced conclusions into fraudulent misstatements or omissions simply by saying that there were abuses or misuses of the GAAP rules. See DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) ("At one time the firm bathes itself in a favorable light. Later

10

the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. 'Must be' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition."). Likewise, plaintiffs cannot make allegations that strongly support the defendants' guilty knowledge of securities fraud, on the issues of acquisition accounting here raised, by throwing out large numbers with no factual basis for ascertaining what the "truth" was. See In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 199 (1st Cir. 2005) (holding that alleged overstatement of financial results did not contribute to an inference of scienter because complaint gave "no indication whatsoever what the size of the alleged overstatement of current profits was").

For all these reasons, we cannot derive a strong inference of scienter against Bernhard, Belk and Shaw. Plaintiffs have failed to allege a sufficient basis for defendants' knowledge or severe recklessness as to the accuracy of the accounting standards for the Stone & Webster and IT Group acquisitions.

2.    Percentage of Completion Accounting

Plaintiffs allege that Shaw inflated its earnings by prematurely recognizing revenue on long-term contracts. A substantial portion of the company's business derives from the performance of long-term engineering, procurement and construction contracts, each of which is, by plaintiffs' admission, unique and complicated. The preferred accounting standard for such contracts is the "percentage of completion" method, used and disclosed by Shaw in its financial reports, whereby a company records revenue as it performs work on a contract. The company first estimates the total cost of contract performance and then compares the estimate with actual costs over the life of the contract. As work proceeds, the company records the corresponding percent of the revenue

11

that should be recorded on the company's books. When, however, reasonably dependable estimates cannot be made or "inherent hazards" relating to contract conditions make profit predictions unreliable, the "completed-contract" method becomes preferable; it recognizes revenue and expenses incurred on a contract only in the year of completion. In re Stone & Webster, 414 F.3d at 196-97.

Shaw allegedly prematurely recognized revenue on long-term contracts in violation of GAAP. Shaw's management pressured, coerced and if necessary, forced employees to inflate the percentage of completion of their projects and accelerate earnings recognition. (Compl. ¶ 98.) Second, Shaw lacked the internal controls necessary to estimate the percentage of completion accurately because its proprietary software program for project tracking, Shaw-Trac, did not work.[5] Because Shaw could not make reasonably dependable estimates, the plaintiffs contend that it should have used the completed contract method and deferred recognizing revenue until the contracts were completed.

Overriding the specific allegations, which will be discussed below, are systematic deficiencies and an inherent contradiction in the pleadings. The plaintiffs rely heavily on confidential sources for their allegations. But they generally fail to provide sufficient details about their sources to credit their statements and fail to tie those statements to the large scale accounting fraud that allegedly took place. Further, the fact that the company's internal accounting controls did not work properly does not necessarily lead to the

---

[5] Shaw described Shaw-Trac in its annual report as follows: "SHAW-TRAC is a web-based, proprietary earned value application that enables the Company to effectively manage and integrate the many phases of a capital project, from estimating to engineering through construction and start-up. Users from around the world consistently access Shaw-Trac through the public networks in order to update and understand the real-time financial position of respective projects." (Compl. ¶ 56.) (quoting Shaw Group Inc., Annual Report (Form 10-K), at 4 (Nov. 27, 2002)).

conclusion that revenues were consistently overstated on the company's financial reports. Because errors could bias the figures down as well as up, the inference that such errors demonstrate an intent to defraud is weak. Finally, as with the company's acquisition accounting, Shaw has never corrected, repudiated or recalculated its use of the percentage of completion method on its long-term contracts.

To support the allegations of scienter on the part of Bernhard and Belk, plaintiffs contend that Shaw pressured employees to inflate the percentage of completion numbers; that Bernhard and Belk knew about Shaw-Trac's deficiencies; that they had access to allegedly incriminating internal reports; and that they must have known about the alleged overstatement of contract revenues. Each of these subjects requires discussion.

The only pleadings that connect either of these defendants to pressuring of employees are two statements attributed to Bernhard. It is asserted that Bernhard told several Shaw executives during a dinner conversation that, "We have got to show more progress," on Shaw's construction projects. (Compl. ¶ 8). Plaintiffs would draw the inference that he was advising the others to report higher completion rates on the construction projects than had actually been achieved. Second, in or about June 2002, a "former confidential insider" heard Bernhard scream at a company financial analyst named Scott Roussell because Shaw's revenue numbers were too low and he "needed to do something to fix that." (Compl. ¶ 280.) After this incident, the confidential source claims to have "heard Roussell call various operations centers in order to get them to increase their percentages of completion on Shaw's projects to 'help with the numbers.'" (Compl. ¶ 280.)

The dinner table remark is insufficient to support an inference of scienter on Bernhard's part. Initially, plaintiffs offer no source, documentary or personal, for this comment. See ABC Arbitrage, 291 F.3d at 358. Plaintiffs fail to allege with particularity when this comment was made. See Southland, 365 F.3d at 376-77. But even if Bernhard made the statement, a more likely, nonculpable inference, absent any other details, is that Bernhard was commenting on the need to improve the company's business performance.

Bernhard's "do something to fix that" statement suffers from similar deficiencies. The confidential source is not identified sufficiently by his title, work location, or dates of employment to reassure the reader that he heard and understood the meaning of the remark. See Central Laborers, 497 F.3d at 552. Further, the statement cannot contribute to a strong inference of scienter because it is "susceptible to many interpretations, including innocent ones." In re Integrated Elec. Servs., Inc., No. 4:04-CV-3342, 2006 WL 54021, at *4 (S.D. Tex. Jan. 10, 2006) (unpublished) (holding that comment by corporate manager to employee was too ambiguous to support strong inference of scienter), aff'd, Central Laborers, 497 F.3d 546 (5th Cir. 2007). Bernhard may have simply been pointing out an error that needed to be corrected.

Bernhard and Belk allegedly knew about Shaw-Trac's malfunction in several ways. The complaint alleges that in May 2002, a letter detailing problems with Shaw-Trac was sent to "senior Shaw insiders responsible for Shaw-Trac's development." (Compl. ¶ 71.) Whether Bernhard and Belk were among the recipients or how they may have learned of its contents, however, is not stated, nor does the complaint allege who wrote the letter or just what it said. This allegation is too vague to allow an inference of scienter.

More pointedly, plaintiffs allege that "Bernhard knew that Shaw-Trac was not functional" when Shaw began using the program in mid-2001. They claim that Bernhard insisted on rolling out Shaw-Trac because he wanted to use it as a marketing tool with potential customers. By 2003, it is alleged, Shaw began to move away from the program because it did not work, and Bernhard then directed the company IT department to develop Shaw-Trac Lite, a simplified new program that also failed to work. (Compl. ¶ 74.) Plaintiffs do not, however, supply documentary or personal sources for the majority of these allegations.[6] This court has explained that "general allegations and conclusory statements, such as stating [defendants] knew . . . adverse material" do not contribute to a strong inference of scienter. See Blackwell, 440 F.3d at 289-90. Because there is no factual support for the allegation that Bernhard knew that Shaw-Trac was dysfunctional when it was rolled out, the allegation fails to support a strong inference of scienter.[7] Compare In re Stone & Webster, 414 F.3d at 205 (holding

---

[6] Two of plaintiffs' allegations about Bernhard's involvement with Shaw-Trac have sources: (1) the claim made by an anonymous former Shaw employee that Bernhard rolled out Shaw-Trac because he saw it as a marketing tool, and (2) the claim made by an anonymous former Shaw employee that Shaw-Trac Lite was a stripped-down version of Shaw-Trac. Both confidential sources are insufficiently identified to determine whether someone in their positions would have access to the information alleged. Nonetheless, these claims are innocuous. There is nothing fraudulent about a company marketing its software programs to attract new customers or changing its software programs. See, e.g., Abrams, 292 F.3d at 433 ("A planned improvement or upgrade [to an internal controls program] does not mean that the prior system was necessarily producing bad data. A perfectly reasonable explanation for implementing [the new program] was to improve efficiency and lower costs.").

[7] Plaintiffs argue on appeal that their complaint identifies a confidential source, a former project controls manager who assisted in the design and implementation of Shaw-Trac, who stated that Bernhard knew Shaw-Trac did not work. The complaint, however, does not indicate the source of the allegation. (Compl. ¶ 61.) "Needless to say, in reviewing a Rule 12(b)(6) dismissal, we review only the well-pleaded facts in the complaint. This new allegation may not be considered." Blackwell, 440 F.3d at 289.

allegations of communications from customer to defendant were "too vague to support a strong inference" that defendants "were aware of them or, if so, were reckless in failing to take them seriously"). Further, the allegation of Shaw-Trac's problems may indicate corporate mismanagement, but the securities laws do not protect investors against negligence. See Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1070 (5th Cir. 1994) ("[C]orporate mismanagement does not, standing alone, give rise to a 10b-5 claim . . . ."); Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) (same).[8] Plaintiffs do not state facts that support an inference that Bernhard rolled out Shaw-Trac with intent to deceive or with severe disregard of its potential to mislead investors.

Belk is alleged to have been "informed, in great detail, by a former Baton Rouge project controls manager, of all the problems associated with the use of Shaw-Trac." (Compl. ¶ 73.) In Southland, this court found wanting a similar scienter allegation. 365 F.3d at 375-76. There, securities fraud plaintiffs alleged that corporate insiders, including named individual defendants, were repeatedly told by programmers and developers that one of the company's technology products would not work as represented. Id. The court held this allegation "insufficient because it fail[ed] to state when, where or on what occasion or occasions this occurred, fail[ed] to in any way identify the [company's] programmers and developers involved, and [did] not indicate whether their statements were oral or written or give[] any meaningful particulars as to what was stated." Id. at 376. In this case, plaintiffs' allegation also lacks particularity concerning when, how and what the confidential source told Belk,

---

[8] See also Abrams, 292 F.3d at 433 (stating that the nature of accounting problems that lead to restatement could "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action").

and it lacks sufficient detail to support the probability that the source was in a position to know about "all of the problems" related to Shaw-Trac or that these problems pervaded the company. See ABC Arbitrage, 291 F.3d at 353; see also Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 155 (3d Cir. 2004) (rejecting use of statements from local branch office employees to substantiate allegations about nationwide company practices).

Finally, plaintiffs allege that the defendants knew or were severely reckless in not knowing about Shaw-Trac's problems because, according to numerous confidential sources, the problems were widely known throughout the company. (Compl. ¶¶ 26, 72.) The "defendants must have known" allegation was rejected by this court in Abrams, 292 F.3d at 432, as too vague to support a strong inference of scienter.

Turning to more general allegations that the executive defendants knew or should have known that Shaw was prematurely recognizing revenue from its long-term contracts, plaintiffs first point to their receipt of monthly reports on the progress of contracts, which were discussed at meetings. (Compl. ¶ 24-29.) The complaint does not, however, allege that the reports or the meetings included information at odds with Shaw's public statements. See Abrams, 292 F.3d at 433.[9] In fact, the complaint alleges that the reports were already inaccurate when prepared because they contained allegedly unreliable data derived from Shaw-Trac.[10] Thus, these allegations do not substantiate an

---

[9] See Tuchman, 14 F.3d at 1069 (holding that plaintiffs could not satisfy their pleading burden on scienter without "alleg[ing] any facts that show that [any of defendant's alleged] statements were belied by his actual knowledge of contradictory facts").

[10] The complaint states: "[B]ecause Shaw-Trac did not work, any data obtained from Shaw-Trac and any reports created by Shaw-Trac, including the One-Page Reports, were

inference that Bernhard and Belk knew they contained false information, nor does the mere fact that they received the reports imply that they knew of any inaccuracy.

Plaintiffs also assert that the magnitude and egregiousness of Shaw's premature revenue recognition create an inference of scienter by Bernhard and Belk. According to their brief, Shaw "improperly recognized millions of dollars of revenue on every single one of its EPC contracts," and because of their size, "even minimal percentage increases caused material overstatement[s] of Shaw's income." Such bold statements cannot substitute for factual assertions connecting the corporate executives to specific contracts or accounting or management practices that led to the alleged overstatements. Yet particularized assertions are lacking here.[11] Moreover, a single confidential source identified as a "former independent contractor for [Stone & Webster] and then Shaw" contributed these allegations, but the complaint does not state how long the contractor worked for Shaw, when he learned the information alleged, or how he was in a position to know the practices of every superintendent on every Shaw project. See ABC Arbitrage, 291 F.3d at 353. Without such details, we cannot credit these allegations as a basis for a strong inference of scienter. The only

---

corrupt and inherently unreliable." (Compl. ¶ 26.)

[11] In Shushany v. Allwaste, Inc., this court held that plaintiffs failed to state a claim for fraud based on accounting irregularities because "the complaint did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendant's] financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position. Although we need not identify which of these deficiencies, standing alone, might render the complaint insufficient under Rule 9(b), we hold that altogether, they do." 992 F.2d 517, 522 (5th Cir. 1993).

specific observation by this source is that he saw a construction superintendent incorrectly record that 200 feet of pipe had been installed when, in fact, only 120 feet had been. (Compl. ¶ 277.) And even the location and date of this allegation are not pinpointed.

After considering plaintiffs' scienter allegations together, we conclude they do not state with particularity facts giving rise to a strong inference that the defendants knew or were severely reckless in not knowing that Shaw was prematurely recognizing revenue on its long-term contracts.

## B. Viability of the LSP-Pike Project

Plaintiffs allege that Shaw failed to timely or fully disclose material concerns affecting the viability of a major construction project. In September 2001, Shaw announced that it had signed an agreement with NRG Energy, Inc. to construct two power plants, one of which was known as the LSP-Pike project. On August 5, 2002, however, Shaw announced that NRG had experienced liquidity problems and would not make its next scheduled $32 million milestone payment on the project. See Shaw Group Inc., Press Release (Form 8-K) (Aug. 5, 2002). Shaw also announced that it had reached an agreement with NRG to acquire substantially all of the assets of Pike in exchange for forgiveness of current sums owed to Shaw and a payment of $43 million to NRG by Shaw. Id. Shaw noted that if the companies could not implement the agreement and NRG failed ultimately to complete its scheduled payment, there could be a material adverse effect on Shaw's ability to meet its earnings expectations. Id. Shaw's stock price immediately dropped.

Whether viewed from the perspective of substantive liability standards, the complaint's use of a confidential source, or the gap between plaintiffs'

pleading and their misleading characterizations of the complaint on appeal, these allegations fail to support a strong inference of scienter against Bernhard, Belk or Shaw. As with the preceding claims, Bernhard and Belk are not specifically connected in any way to Shaw's August 2002 disclosure or its nondisclosures or the timing of disclosures concerning this project, nor does the confidential source tie the defendants to ongoing knowledge about the project's status.

First, plaintiffs' underlying theories of securities fraud are that Shaw (a) should have disclosed earlier its knowledge that the project was in financial jeopardy or (b) did not disclose enough about the project's difficulties. They cite no caselaw or SEC rules to support these claims. In general, a corporation "does not commit securities fraud merely by failing to disclose all nonpublic material information in its possession." Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996), superseded by statute on other grounds as recognized in Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999). This court has affirmed that "[l]iability under Rule 10b-5 for nondisclosure arises if there is a duty to speak." Kaplan v. Utilicorp United, Inc., 9 F.3d 405, 407 (5th Cir. 1993). Plaintiffs do not explain why Shaw had an affirmative duty to disclose NRG's missed payments or other problems concerning this one construction project before August 5, 2002.

Similarly, their claim of incomplete disclosure is actionable only if what they said is misleading. "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002); see also McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 998 (10th Cir.

2002) ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.") (internal quotation marks omitted)). Plaintiffs' allegations do not meet this standard. Even assuming arguendo that the omitted information was material, Shaw's announcement neither stated nor implied anything about the history of Shaw's relationship with NRG. Shaw's omission of information about its alleged problems with NRG before August 2002 did not make its announcement untrue or misleading.[12]

Second, plaintiffs make no attempt to state with particularity facts giving rise to a strong inference that either Bernhard or Belk knew or was severely reckless in not knowing about the LSP-Pike project difficulties long before NRG missed a payment in August 2002. We indulge the assumption that the confidential source occupied a position that enabled him to know about NRG's internal financial problems that ultimately caused it to miss a milestone payment. See ABC Arbitrage, 291 F.3d at 353. Nonetheless, the complaint does not indicate how or when the officers became aware of what the confidential source allegedly knew. Cf. Kushner v. Beverly Enters., Inc., 317 F.3d 820, 828 (8th Cir. 2003) (holding that an allegation that someone involved in a fraudulent scheme reported to one of the named defendants was "not specific enough to

---

[12] In Winer Family Trust v. Queen, 503 F.3d 319, 330 (3d Cir. 2007), the court rejected similar allegations that a company's press release was misleading because it omitted information about the history of its relationship with a business partner. There, Pennexx announced that an equity investment made by Smithfield Foods helped facilitate Pennexx's common stock registration. Id. Plaintiffs argued that this statement was misleading because Pennexx failed to disclose that a prior venture between Pennexx and Smithfield had been disastrous. Id. The court concluded that plaintiffs failed to explain why this omission made the press release misleading or untrue. Id. Winer is analogous to the present case.

support a strong inference that [the defendant] knew of or participated in the fraudulent practice while it was occurring").

Third, the plaintiffs contend in their appellate brief that their confidential source arranged a special meeting in April 2002 with the defendants and others to discuss the LSP-Pike project problems. But the complaint tells a different story. Although it states that the source organized a meeting, it does not state that these defendants attended or how they allegedly learned what was discussed at the meeting.[13] As has been noted, "we review only the well-pleaded facts in the complaint. This new allegation may not be considered." Blackwell, 440 F.3d at 289. Plaintiffs also allege in their brief but not in their complaint that it is "inconceivable" that the defendants did not know about the status of the LSP-Pike project because "Shaw's financial health was dependent on, in large part, the success of the LSP-Pike project, a $340 million contract." The complaint states neither that Shaw's "financial health" depended on the project nor that it was a $340 million contract. In any event, defendants' status within the company is inadequate for an inference of knowledge about alleged misstatements. See Abrams, 292 F.3d at 432.

No viable inferences of guilty knowledge as to these defendants arises from plaintiffs' allegations concerning the LSP-Pike project.

C.    Inflated Backlog and Slow/No Pay of Vendors

The complaint alleges that Shaw misrepresented its financial condition by including in its backlog figures projects that were "contingent, potential,

---

[13] The complaint states: "In April 2002, the former controls manager convened a special meeting at [Shaw's] Baton Rouge headquarters to discuss the serious problems with the LSP-Pike project concerning millions of dollars of outstanding invoices and NRG's failure to grant Shaw a full notice to proceed." (Compl. ¶ 86.)

uncommitted and not documented" and by maintaining a widespread company practice of delaying or not paying vendors toward the end of each fiscal quarter to artificially inflate its cash flow reports.  The complaint states no facts with particularity that suggest the inference that Bernhard or Belk knew about or sanctioned or ordered these alleged practices.  Moreover, plaintiffs' brief does not argue how these claims might be salvaged.  We deem the un-briefed claims to be abandoned.

D.    Motive and Opportunity Allegations

To buttress whatever other inferences of scienter might be drawn from their substantive allegations, the plaintiffs allege that Bernhard and Belk had both motive and opportunity to engage in the charged securities fraud.  To demonstrate motive, plaintiffs must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.  Merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement." Phillips v. LCI Int'l, Inc., 190 F.3d 609, 621 (4th Cir. 1999) (internal quotation marks and citation omitted).  As high-ranking corporate officers, the defendants had an opportunity to commit fraudulent acts.  The question here is whether plaintiffs sufficiently alleged as motives that the defendants sold their stock at "inflated" prices, earned bonuses during the class period, sought to use artificially inflated stock as currency for corporate acquisitions, and aimed to maintain the company's favorable credit rating.

Because corporate executives are often paid in stock and stock options, they will naturally "trade those securities in the normal course of events," and courts "will not infer fraudulent intent from the mere fact that some officers sold

stock." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997) (Alito, J.). Insider stock sales may be probative of scienter, however, if they occur in "suspicious amounts or at suspicious times." Abrams, 292 F.3d at 435. Suspicion may be generated if the "sales are out of line with prior trading practices or [made] at times calculated to maximize personal profit." Central Laborers, 497 F.3d at 553 (quoting Abrams, 292 F.3d at 435). Pursuant to Tellabs, of course, both culpable and nonculpable explanations for stock sales, as revealed in the pleadings and associated documents, must be considered.

During the first nine months of the class period, Bernhard and Belk sold large blocks of Shaw stock. Bernhard's sales occurred in January and July 2001, while Belk's sole large sale took place in January 2001. Plaintiffs assert that these sales were suspicious because they took place near the market peak for Shaw stock (if up to $20 below the market high is near the "peak"), and they far exceeded these defendants' previous trades in company stock. Placed in context, the allegations are overstated and innocuous. When Bernhard sold in January 2001, only a few days had passed after the expiration of his "lock-up" agreement not to sell shares for ninety days following Shaw's October 2000 equity offering. During the "lock-up" period, Shaw stock split two-for-one and doubled his holdings. See Shaw Group, Inc., Quarterly Report (Form 10-Q), at 7 n.2 (Jan. 16, 2001). It is quite plausible that Bernhard sold stock in January to take a profit on some of his newly acquired shares. His July sale followed a positive earnings announcement by Shaw, but he missed the immediate price spike following the announcement. See Southland, 365 F.3d at 369 (stating that insider's stock sales were not suspicious, in part, because they did not come immediately after an allegedly misleading statement caused spike in share price).

24

Plaintiffs allege that Belk sold fifty-seven percent of his Shaw stock immediately after the positive earnings announcement in January 2001, marking only his second sale of company shares. But plaintiffs tell only half the story. Shaw's SEC filings, referenced in the complaint, reveal that Belk had actually sold Shaw stock twice before the block sale in question, and a February 2000 sale disposed of approximately sixty-five percent of his holdings at that time. See Shaw Group, Inc., Statement of Change in Beneficial Ownership of Securities (Form 4) (Sept. 11, 2000); Shaw Group, Inc., Statement of Change in Beneficial Ownership of Securities (Form 4) (Feb. 25, 2000). Thus, the amount of his January sale was not out of line with his past actions or timing. Further, the sale allowed him to capitalize on the expiration of his own ninety-day lock-up period and the Shaw stock split.

Insofar as their executive compensation packages were tied to company performance, and both men received bonuses during the class period, Bernhard and Belk are in no different position than the vast majority of corporate executives. Consequently, this court has held that incentive compensation "can hardly be the basis on which an allegation of fraud is predicated." Tuchman, 14 F.3d at 1068 (internal quotation marks omitted); see also Abrams, 292 F.3d at 434. Incentive compensation packages may be considered in conjunction with other scienter allegations, Barrie, 397 F.3d at 264, but only in an extraordinary case is it probative. See MCI WorldCom, 340 F.3d at 250 (holding that compensation package was probative where MCI WorldCom CEO Bernard Ebbers had a unique pay package and stood to lose millions if WorldCom's stock price dropped significantly). Bernhard's and Belk's packages of bonus and stock

options during the class period, while generous, were hardly extraordinary; as a motivation to fraud, they were minor.

Plaintiffs wind up their general motive allegations by asserting that Bernhard and Belk wanted to maintain Shaw stock at artificially high prices to increase its value in acquiring companies like IT Group, Scott Sevin & Shaffer, and Technicomp during the class period, and they wanted to maintain its credit ratings. Scienter in a particular case may not be footed solely on motives universal to corporate executives. See Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000). The outlier to the acquisition proposition, however, is MCI WorldCom, whose need to complete a "crucial" $129 billion merger with Sprint gave the company a motive to inflate its financial results. MCI WorldCom, 340 F.3d at 242, 250. Shaw's acquisitions are comparatively modest. Plaintiffs also allege that defendants refused to write off impaired goodwill following the Stone & Webster and IT Group acquisitions because they feared an impact on Shaw's debt covenants and a consequent downgrade of its credit rating. "The desire to maintain a high credit rating is universally held among corporations and their executives and consequently does not contribute significantly to an inference of scienter." Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 664 (8th Cir. 2001).

E.    Sarbanes-Oxley Act Certifications

Almost as an afterthought, plaintiffs allege that the Sarbanes-Oxley certifications signed by Bernhard and Belk, which attest to the accuracy of Shaw's SEC filings, contribute to a strong inference of scienter. Under the Sarbanes-Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports. See 15 U.S.C. § 7241(a). The

report must identify the officer's basis for making the certification and each officer must certify that he and other officers are "responsible for establishing and maintaining internal controls." 15 U.S.C. § 7241(a)(4)(A). Moreover, the officers must certify that they have "evaluated the effectiveness of the issuer's internal controls" within the previous ninety days and have "presented in the report their conclusions about the effectiveness of their internal controls." 15 U.S.C. § 7241(a)(4)(C), (D). Bernhard and Belk both signed Sarbanes-Oxley certifications from 2002 on, as certifications were attached to the quarterly and annual reports. According to plaintiffs, the certifications were false because the defendants knew that Shaw's internal accounting controls were defective and its financial statements misleading.

In Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006), the court concluded that a Sarbanes-Oxley certification, standing alone, is not indicative of scienter. This court has cited the Garfield analysis approvingly. Central Laborers, 497 F.3d at 555. To hold otherwise, the Eleventh Circuit reasoned, would mean that "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." Garfield, 466 F.3d at 1266. Instead, the court held that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." Id. There must be, in other words, facts establishing that the officer who signed the certification had a "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or

27

omissions." Id. From the foregoing analysis of all of plaintiffs' allegations, no such facts placed Bernhard or Belk on notice of glaring irregularities or red flags.

F.    Section 20(a) Control Person Liability

Although the plaintiffs alleged that Bernhard and Belk are liable as control persons under Section 20(a) of the Securities Exchange Act of 1934, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." Southland, 365 F.3d at 383. Because we have found the pleadings of Section 10(b) and Rule 10b-5 liability inadequate, and because plaintiffs have furnished no independent briefing on this claim, it must be dismissed.

## CONCLUSION

Whether analyzed as separate claims or in toto, plaintiffs' allegations satisfy neither Tellabs' nor this court's standards, construing the PSLRA, for pleading facts that create a strong inference of scienter necessary to pursue further their securities fraud claims. The district court erred in denying the motion to dismiss the complaint. Its judgment is REVERSED, and the case REMANDED WITH INSTRUCTIONS TO DISMISS.