# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-20519

United States Court of Appeals
Fifth Circuit

**FILED**

July 15, 2014

Lyle W. Cayce
Clerk

PAUL SPITZBERG; STEPHEN GERBER,

Plaintiffs - Appellants

v.

HOUSTON AMERICAN ENERGY CORPORATION; JOHN F. TERWILLIGER; JAY JACOBS; E. HOWARD KING, JR.; J. ALEX LOFTUS; O. LEE TAWES, III; EDWIN C. BROUN, III; STEPHEN HATTZELL; JOHN BOYLAN; RICHARD J. HOWE; KENNETH A. JEFFERS,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, ELROD, and COSTA, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this case, Plaintiffs-Appellants have sued Defendants-Appellees in a private action for securities fraud under § 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5. Accordingly, Plaintiffs-Appellants are obliged under the Private Securities Litigation Reform Act ("PSLRA") to conform the allegations in their complaint to the heightened pleading requirements set forth at 15 U.S.C. § 78u-4. Arguing that Plaintiffs-Appellants failed to meet these standards, Defendants-Appellees filed a motion to dismiss on January 14, 2013.

On August 22, 2013, the district court granted Defendants-Appellees' motion on two grounds. First, the district court concluded that Plaintiffs-

No. 13-20519

Appellants' allegations did not support a sufficiently strong inference of Defendants-Appellees' scienter under 15 U.S.C. § 78u-4(b)(2). Second, the district court concluded that Plaintiffs-Appellants failed to allege that Defendants-Appellees' "misstatements or omissions were the actual cause of [Plaintiffs-Appellants'] economic loss as opposed to other explanations, e.g., changed economic circumstances" under 15 U.S.C. § 78u-4(b)(4). On appeal, Plaintiffs-Appellants argue that the district court erred on both grounds.

In response, Defendants-Appellees argue that both of the district court's grounds for dismissal were proper. Moreover, in Defendants-Appellees' view, the district court's judgment should also be upheld on three alternative grounds. First, Defendants-Appellees argue that Plaintiffs-Appellants failed to plead the falsity of Defendants-Appellees' statements with sufficient particularity under 15 U.S.C. § 78u-4(b)(1). Second, Defendants-Appellees argue that the safe harbor provision for forward-looking statements under 15 U.S.C. § 78u-5 should be applied to certain of Defendants-Appellees' allegedly false statements. Third, Defendants-Appellees argue that the two-year statute of limitations under 28 U.S.C. § 1658(b)(1) had run with respect to certain of Defendants-Appellees' allegedly false statements.

As explained below, we reverse and remand. While some or all of Defendants-Appellees' factual arguments may ultimately prevail based on the evidence presented during later stages of these proceedings, the complaint was sufficiently pled under 15 U.S.C. § 78u-4 and § 78u-5. As for the running of the statute of limitations under 28 U.S.C. § 1658(b)(1), the district court was correct to conclude that this issue could not be decided on a motion to dismiss in the present case.[1]

---

[1] The district court also correctly reasoned that Plaintiffs-Appellants' claim for control person liability under 15 U.S.C. § 78t cannot proceed in the absence of a primary violation of the securities laws. *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353,

No. 13-20519

I.

Plaintiffs-Appellants are investors who allege that they purchased Defendants-Appellees' stock in reliance on Defendants-Appellees' material misrepresentations between November 9, 2009, and April 18, 2012. Defendants-Appellees include a small company named Houston American Energy Corporation, two of this company's three employees, and a number of other individuals who sat as directors of the company. One of the company's principal activities was the development of an oil-and-gas concession in Colombia. The company did not conduct its own drilling operations, but worked instead through a business partner, SK Innovation/SK Energy, which is not a party to this lawsuit. Plaintiffs-Appellants allege that they were injured by the fall in stock prices when Defendants-Appellees' statements regarding the oil-and-gas concession in Colombia were publicly revealed to be false.

The first allegedly fraudulent statement at issue in this case pertained to one of the hydrocarbon blocks in Colombia, known as the "CPO 4 Block," in which Defendants-Appellees owned an interest. The statement occurred in a slide presentation given by Defendants-Appellees in November 2009. A copy of the slide presentation was appended to Defendants-Appellees' Form 8-K disclosure filed with the Securities and Exchange Commission ("SEC") on November 9, 2009. In its entirety, the challenged statement in Defendants-Appellees' slide presentation reads as follows: "CPO 4 Block consists of 345,452 net acres and contains over 100 identified leads or prospects with estimated recoverable reserves of 1 to 4 billion barrels[.]" In Plaintiffs-Appellants' view,

_____

383 (5th Cir. 2004) ("Control person liability is secondary only and cannot exist in the absence of a primary violation."). Because we hereby reverse the district court's judgment with respect to scienter and loss causation under 15 U.S.C. § 78u-4, the district court's decision regarding control person liability is also reversed.

No. 13-20519

Defendants-Appellees' use of the term, "reserves," communicated to investors that certain geological testing had been completed based on the definition of "reserves" used by the oil industry and by SEC regulations.

As explained in a release published by the SEC on January 14, 2009, many of the "reserves definitions" that must be used in regulatory disclosures filed with the SEC are "designed to be consistent with the Petroleum Resource Management System (PRMS)."[2]  Apart from its significance for regulatory purposes, the PRMS is also "a widely accepted standard for the management of petroleum resources developed by several industry organizations."[3] According to Plaintiffs-Appellants, the PRMS states that a reservoir of hydrocarbons can only constitute "reserves" where the "commercial productibility" of the reservoir is "supported by actual production or formation tests."  Plaintiffs-Appellants argue, therefore, that the statement made regarding "reserves" in Defendants-Appellees' slide presentation would have communicated to investors that either "actual production" or "formation tests" had already occurred on the CPO 4 Block.  As Defendants-Appellees concede, however, no actual production had occurred in connection with Defendants-Appellees' oil-and-gas concession in Colombia as of November 2009.  Moreover, Defendants-Appellees' test drilling would not begin until more than a year after the statement regarding "reserves" was made in the slide presentation.

Following the slide presentation, Plaintiffs-Appellants allege that online postings in 2010 by websites providing news on the financial markets, *Seeking Alpha* and *Sharesleuth*, took issue with Defendants-Appellees' statement regarding "reserves."  As quoted in Plaintiffs-Appellants' complaint, the *Sharesleuth* posting observed that Defendants-Appellees' "investor

---

[2] SEC, Modernization of Oil and Gas Reporting, 74 Fed. Reg. 2158, 2160 (January 14, 2009).

[3] *Id.* at 2160 n.15.

4

presentation and subsequent Securities and Exchange Commission filing" had claimed that Defendants-Appellees' oil-and-gas concession contained more "recoverable reserves" than "all of Colombia," which was "one of the most audacious claims by any of the energy companies operating in that country."

As Defendants-Appellees emphasize, however, the slide presentation does not explicitly represent that any drilling had yet occurred on the CPO 4 Block. The only references to drilling in connection with the CPO 4 Block in the slide presentation are ambiguous. The first is a brief note identifying "2 Exploration Wells" as a "Work Obligation" during "Phase 1" of the project and identifying "3 Exploration Wells" as a "Work Obligation" during "Phase 2" of the project. The second is an item in the budget "through December 2010" set forth in the slide presentation, which allocated funding for "2 Well Prep." Based on these sparse references, Defendants-Appellees argue that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the PRMS." As counsel for Defendants-Appellees stated before this court during oral argument, "wells aren't drilled in secret" and "if there had been wells drilled . . . you would have told about the wells drilled in the presentation." As is also relevant, and as is discussed below in further detail, the slide presentation also contained a lengthy disclaimer regarding its use of certain terms that were prohibited in ordinary SEC filings.

The remaining allegedly fraudulent statements were all made during the period after test drilling began in July 2011 and before Plaintiffs-Appellants filed their complaint in this lawsuit in April 2012. In a number of regulatory filings and press releases, Defendants-Appellees repeatedly stated that the test well known as "Tamandua #1" on their oil-and-gas concession had produced "strong inflow[s]" and "significant shows" of both "gas and oil." For example, in a Form 8-K filing on October 5, 2011, Defendants-Appellees stated that they had experienced a "strong inflow of hydrocarbons" and "strong shows

of hydrocarbons (gas and oil) in the first objective sand, the C-7." Again, in a Form 10-Q filing on November 8, 2011, Defendants-Appellees stated that "the well encountered indications of oil and a significant amount of associated gas from the uppermost pay sand expected in the well (the C-7) between the interval of approximately 12,200 feet to 12,500 feet."

But according to the statements of confidential witnesses that were allegedly involved in the drilling operations, the test well at Tamandua #1 produced no "inflow[s]" or "shows" of oil or "flowable hydrocarbons" during test drilling. These statements are quoted and cited extensively in Plaintiffs-Appellants' complaint. Specifically, the complaint refers to a confidential witness designated as "CW 3," who "was the management representative from SK Innovation Co. on the Partners' management committee that made the decisions about the exploration, drilling and production of the wells in the CPO 4 block" in Colombia. The complaint characterizes CW 3's testimony as follows: "According to CW 3, neither oil nor flowable hydrocarbons were found in the Tamandua #1 well." The complaint also states that, "as CW 3 described the situation, it was not 'factual' or accurate to represent that the well had exhibited 'oil.'" During oral argument before this court, counsel for Defendants-Appellees discounted the relevance of all other confidential witnesses mentioned in Plaintiffs-Appellants' complaint, because their testimony was based on rounds of well testing that were performed at a date subsequent to the allegedly false disclosures. Counsel for Defendants-Appellees conceded, however, that CW 3's testimony is relevant because he was "around at the time."

Several events occurring in early 2012 are also relevant to the district court's decision in this case. In "February 2012 or March 2012," Defendants-Appellees decided to conduct a second well test at Tamandua #1. Although Defendants-Appellees' business partner, SK Innovation, had assisted

Defendants-Appellees throughout the first round of well testing at Tamandua #1, SK Innovation declined to assist with the second round of testing. Defendants-Appellees therefore conducted the second well test "on a 'sole risk basis,' meaning that they would pay themselves to do it." As context, Defendants-Appellees spent "approximately $5 million" to conduct the second well test, whereas approximately "$30 million to $50 million" had been spent on the drilling operations and first round of well testing between July 2011 and January 2012.

When the second well test also finally "revealed no flowable hydrocarbons," the Defendants-Appellees and SK Innovation decided "to abandon the well" at Tamandua #1. Defendants-Appellees and SK Innovation then moved operations to a second site elsewhere on the oil-and-gas concession, known as "Negretos," to drill a second test well. There is no indication in the record as to what was shown by any tests at Negretos or any tests at further sites within Defendants-Appellees' oil-and-gas concession. Upon disclosure that the well at Tamandua #1 would be abandoned, Defendants-Appellees' stock price "plummeted $1.24 per share, or 35.5%, to close at $2.25 per share on April 19, 2012."

At roughly the same time as the second well test at Tamandua #1, on February 10, 2012, Defendants-Appellees received subpoenas issued by the SEC pursuant to a "nonpublic formal order" of investigation in connection with possible misstatements "in the late 2009 and early 2010 time period regarding resource potential for the CPO-4 prospect." It is unclear whether Defendants-Appellees' decision to conduct a second well test in February 2012 or March 2012 occurred before or after Defendants-Appellees received the subpoenas from the SEC on February 10, 2012.

Plaintiffs-Appellants filed their original complaint in this lawsuit on April 27, 2012, and a consolidated class action complaint on November 15,

No. 13-20519

2012. Defendants-Appellees filed a motion to dismiss on January 14, 2013, which the district court granted on August 22, 2013.

## II.

We review de novo a district court's analysis of a motion to dismiss.[4] In general, on a motion to dismiss under Rule 12(b)(6) and Rule 8 of the Federal Rules of Civil Procedure, both the district court and this court must assess whether the complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[5]

The elements of a private securities fraud claim based on violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 are: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"[6] Under the traditional rule governing allegations of fraud, Rule 9 of the Federal Rules of Civil Procedure, "a party must state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." However, as this court held in *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532-33 (5th Cir. 2008), the PSLRA heightened the pleading standards for private claims of securities fraud "in two ways." That is, plaintiffs must also, first, allege with particularity why each one of defendants' representations or omissions was "misleading" under 15

---

[4] *Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007).

[5] *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011).

[6] *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011)).

U.S.C. § 78u-4(b)(1) and, second, allege with particularity those facts giving rise to a "strong inference" that the defendant acted with the required state of mind under 15 U.S.C. § 78u-4(b)(2).

On the other hand, as this court emphasized in *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009), the PSLRA did not create heightened pleading standards for all six elements of a claim of securities fraud.  For example, the plain text of 15 U.S.C. § 78u-4(b)(4) provides only that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." Nothing in this language expressly or impliedly heightens the standard of pleading applicable to loss causation.  Accordingly, we are "not authorized or required to determine whether the plaintiff's plausible inference of loss causation [under 15 U.S.C. § 78u-4(b)(4)] is equally or more plausible than other competing inferences, as we must in assessing allegations of scienter under the PSLRA."[7]

## III.

We first consider Plaintiffs-Appellants' argument that the district court erred by misapplying the scienter requirement applicable in a private lawsuit for securities fraud.  Under 15 U.S.C. § 78u-4(b)(2), the plaintiff in such an action must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Accordingly, as the Supreme Court held in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the complaint in such an action will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."

---

[7] *Lormand*, 565 F.3d at 267.

No. 13-20519

In this circuit, "[t]he required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness."[8]  As formulated in *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (citations and internal quotation marks omitted), and reaffirmed in *Indiana Electrical*, 537 F.3d at 533:

> [Severe recklessness is] limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

For its part, the Supreme Court has explicitly refrained on several occasions from addressing whether allegations of recklessness are sufficient to satisfy the scienter requirement under 15 U.S.C. § 78u-4(b)(2).[9]  However, as the Supreme Court observed in *Tellabs*, 551 U.S. at 319 n.3, "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required."

In the present case, Plaintiffs-Appellants have sufficiently pled circumstances constituting at least severe recklessness with respect to both the slide presentation in November 2009 and the statements regarding Tamandua #1 in 2011 and 2012.  To perform this component of our analysis, we assume for the sake of argument that the industry-specific term, "reserves," would indeed communicate to investors that certain production or geological

---

[8] *See id.* at 251 (quoting *Indiana Elec.,* 537 F.3d at 533 (alterations and internal quotation marks omitted)).

[9] *See Matrixx*, 131 S. Ct. at 1323-24; *Tellabs*, 551 U.S. at 319 n.3.

testing had already been conducted, as Plaintiffs-Appellants allege.[10] We also recall Defendants-Appellees' concession that no such production or geological testing had yet occurred as of November 2009. Under such circumstances, Defendants-Appellees' use of this industry-specific term, "reserves," in the 2009 slide presentation would undoubtedly present an "obvious" danger of "misleading buyers or sellers" of Defendants-Appellees' securities as to the value of the company's assets.[11] Indeed, as quoted in Plaintiffs-Appellants' complaint, the *Sharesleuth* article interpreted this statement regarding "reserves" to be "one of the most audacious claims by any of the energy companies operating" in Colombia.

Likewise, assuming the truth of CW 3's statement that "neither oil nor flowable hydrocarbons were found in the Tamandua #1 well," Defendants-Appellees' numerous representations regarding "indications of oil" and "strong inflow[s] of hydrocarbons" may likewise have been obviously misleading to investors. At later stages of these proceedings, no doubt, additional evidence regarding the use of terms such as "flowable," "inflow," and "indications of oil" in the industry may confirm or undermine this factual proposition. At this stage of an action under Rule 10b-5 and the PSLRA, however, Plaintiffs-Appellants' contention about the industry definitions of these terms are "at least as compelling as any opposing inference one could draw" regarding the likely understanding of these terms in this context.[12] We therefore conclude that Plaintiffs-Appellants' complaint cannot be dismissed under 15 U.S.C. § 78u-4(b)(2) based on the failure to plead severe recklessness.

---

[10] *See Tellabs*, 551 U.S. at 322 ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.").

[11] *See Indiana Elec.*, 537 F.3d at 532-33; *Rosenzweig*, 332 F.3d at 866.

[12] *See Tellabs*, 551 U.S. at 324.

No. 13-20519

In the present appeal, the parties have mistakenly focused on the presence or absence of a pecuniary motive for Defendants-Appellees to commit securities fraud.[13]  But as the Supreme Court stated explicitly in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011), "[t]he absence of a motive allegation, though relevant, is not dispositive" under the PSLRA.[14] Even if Defendants-Appellees were unable to benefit financially from their alleged misrepresentations regarding geological testing (when none had been conducted) or regarding the presence of oil and flowable hydrocarbons (when none had been found), such misrepresentations would still be severely reckless and dangerous to investors.[15]  Although motive allegations might "meaningfully enhance the strength of the inference of scienter,"[16] a strong inference of severe recklessness does not depend on such an enhancement in the present case.

As a final matter, we are unable to adopt the district court's reasoning regarding Defendants-Appellees' decision to conduct a second well test at Tamandua #1 in February 2012 or March 2012.  In the district court's view,

---

[13] Defendants-Appellees have also briefly argued that Plaintiffs-Appellants' complaint relies impermissibly on "the collective knowledge of all the corporation's officers and employees." *See Southland*, 365 F.3d at 366.  We reject this argument, as the district court did, due to the extremely small size of the company at issue.  As the complaint plausibly alleges, "[b]y virtue of their positions at Houston American, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth . . . .  As the senior managers and/or directors of Houston American, the Individual Defendants had knowledge of the details of Houston American's internal affairs."

[14] *See also Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation is not fatal."); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) ("Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater.").

[15] *See Lormand*, 565 F.3d at 267; *Indiana Elec.,* 537 F.3d at 532-33).

[16] *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009).

12

Defendants-Appellees' decision "to spend another $5 million for more testing of the well" would "not make sense" if Defendants-Appellees consciously believed that no oil or gas could be found in the CPO 4 Block. In other words, the district court could not accept that Defendants-Appellees' small company would waste such considerable monetary resources in this way on what Plaintiffs-Appellants have characterized as "a desperate 'Hail Mary' decision." The district court therefore concluded that it was unable to draw an inference under 15 U.S.C. § 78u-4(b)(2) that Defendants-Appellees "knowingly" made the false statements.

Even if the district court's inference regarding the illogic of conducting a second well test at Tamandua #1 is correct, the district court's inference fails to resolve any questions relating to Defendants-Appellees' scienter. Whether Defendants-Appellees actually believed that oil could be found in the CPO 4 Block is irrelevant to whether Defendants-Appellees were severely reckless when they allegedly misled investors regarding previous geological testing in November 2009. Likewise, Defendants-Appellees' subjective beliefs regarding the ultimate potential for the CPO 4 Block are irrelevant to whether Defendants-Appellees' statements regarding "indications of oil" and "flowable hydrocarbons" were factually false and severely reckless in 2011 and 2012.

Moreover, the facts supporting the district court's inference regarding the $5 million spent on the second well test at Tamandua #1 also provide support to an alternative explanation for Defendants-Appellees' conduct. By the time of the second well test in February or March 2012, the two websites, *Seeking Alpha* and *Sharesleuth*, had already heavily criticized Defendants-Appellees' statement regarding the CPO 4 Block's "billion barrels" as unrealistically audacious. At roughly this time, on February 10, 2012, Defendants-Appellees also received subpoenas issued by the SEC pursuant to a "nonpublic formal order" of investigation in connection with possible

No. 13-20519

misstatements "in the late 2009 and early 2010 time period regarding resource potential for the CPO-4 prospect."

Based on this pressure from the media and regulators, Defendants-Appellees may have felt the need to substantiate the allegedly irresponsible statements they had made previously. In *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008), Judge Posner analogized corporate decisions of this kind to "embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing."

This interpretation of Defendants-Appellees' actions also might explain the decision by SK Innovation not to participate in the second well test. SK Innovation was not accountable for any of Defendants-Appellees' statements to investors, had not been criticized by *Seeking Alpha* or *Sharesleuth*, and may not even have been aware of the SEC's subpoenas. SK Innovation therefore may not have felt any increased pressure to assist with Defendants-Appellees' "desperate 'Hail Mary' decision" to conduct a second well test.

Accordingly, even if the district court's interpretation of these events does support a strong inference as to a lack of scienter, 15 U.S.C. § 78u-4(b)(2) is nonetheless satisfied in the present case because the competing inference of severe recklessness is at least as cogent and compelling. As recognized by this court in *Lormand*, 565 F.3d at 254 (analyzing *Tellabs*, 551 U.S. at 324), where there are competing inferences that establish or negate the scienter requirement, "a tie favors the plaintiff" on a motion to dismiss under 15 U.S.C. § 78u-4(b)(2). For these reasons, the district court erred by granting the motion to dismiss based on Plaintiffs-Appellants' failure to plead scienter.

IV.

The district court also erred by granting the motion to dismiss based on Plaintiffs-Appellants' failure to allege loss causation under 15 U.S.C. § 78u-

4(b)(4).    According to the district court, Plaintiffs-Appellants' complaint warranted dismissal because it did not allege specifically "whether the alleged misstatements or omissions were the actual cause of their economic loss as opposed to other explanations, e.g., changed economic circumstances or investor expectations or industry-specific facts."    However, the only authority cited by the district court in support of its reasoning, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), does not require this conclusion.    Although the Supreme Court's decision in *Dura*, 544 U.S. at 346, does address the need for plaintiffs to plead loss causation under 15 U.S.C. § 78u-4(b)(4), the Supreme Court explicitly declined to address whether any heightened pleading requirement applies to this element of a securities fraud claim.    Indeed, as described above, the plain text of 15 U.S.C. § 78u-4(b)(4) does not indicate that it imposes any heightened standard, or make any mention of a "particularity" requirement with respect to loss causation.

Moreover, as this court held in *Lormand*, 565 F.3d at 267, and as the Eighth Circuit has also previously held,[17] the courts are "not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as we must in assessing allegations of scienter under the PSLRA."    The district court's decision, therefore, is directly contrary to this circuit's precedent and must be reversed.

In fact, Plaintiffs-Appellants alleged in plain language that they purchased stock at prices that were artificially inflated because of Defendants-Appellees' misrepresentations regarding the CPO 4 Block's resource potential,

---

[17] *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 n.3 (8th Cir. 2003) ("The complaint's allegations of misconduct are involved here only as they relate to the questions of materiality and loss causation.  The new statute does not change traditional pleading rules with respect to these issues.").

and that the market price of the stock declined after the abandonment of Tamandua #1 was announced. As explained by the complaint:

> [Plaintiffs-Appellants], relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Houston American securities at prices artificially inflated by defendants' wrongful conduct. Had [Plaintiffs-Appellants] known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by [Plaintiffs-Appellants], the true value of Houston American securities was substantially lower than the prices paid by [Plaintiffs-Appellants]. The market price of Houston American securities declined sharply upon public disclosure of the facts alleged herein to the injury of [Plaintiffs-Appellants].

The complaint also carefully identifies the amount by which the stock price dropped in 2012 after Tamandua #1 was abandoned: "On this debilitating news, [Defendants-Appellees'] stock price plummeted $1.24 per share, or 35.5%, to close at $2.25 per share on April 19, 2012."

As the Supreme Court explained in *Dura*, 544 U.S. at 344 (quoting the Restatement (Second) of Torts § 548A, Comment b, at 107), the "judicial consensus" is that "a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts . . . become generally known' and 'as a result' share value 'depreciate[s].'" Because Plaintiffs-Appellants sufficiently alleged a similar set of circumstances, Plaintiffs-Appellants' complaint does not warrant dismissal under 15 U.S.C. § 78u-4(b)(4). In accordance with *Lormand*, 565 F.3d at 266-67, although actual loss causation must eventually be proven by a preponderance of the evidence under this provision, the PSLRA does not obligate a plaintiff to deny affirmatively that other factors affected the stock price in order to defeat a motion to dismiss.

As a final matter, Defendants-Appellees have also argued that their announcements regarding the abandonment of Tamandua #1 cannot satisfy the "corrective disclosure" requirement that many courts have relied upon to demonstrate loss causation.[18]  Indeed, in *Dura*, 544 U.S. at 342-43, the Supreme Court reasoned that a corrective disclosure is one that contains "relevant truth" with a logical link to the ultimate drop in stock price, and that merely "[t]o 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires."  Accordingly, as Defendants-Appellees correctly observe, the applicable standard in this circuit under *Lormand*, 565 F.3d at 256 n.20, is that a corrective disclosure must "make the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true)."[19]

That requirement is satisfied by the purported corrective disclosure in this case.  Defendants-Appellees are no doubt correct that Tamandua #1 may ultimately have been abandoned anyway, regardless of the truth of the challenged statements.  Even if the well was encountering "strong inflow[s]" and "significant shows" of both "gas and oil" in October and November 2011, it may nonetheless have become apparent to Defendants-Appellees by April 2012 that Tamandua #1 was not commercially viable.  It may even be conceivable that, if the CPO 4 Block did have "estimated recoverable reserves of 1 to 4 billion barrels" in November 2009, further geological testing might have revealed by April 2012 that those reserves could not be recovered at Tamandua #1 by commercially viable means.

---

[18] *See, e.g., In re Williams Sec. Litig.*, 558 F.3d 1130, 1137 (10th Cir. 2009) ("Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops—assuming, of course, that the plaintiff could isolate the effects from any other intervening causes that could have contributed to the decline.").

[19] *See also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("[T]o establish loss causation this disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements.").

Even so, Defendants-Appellees are wrong to suggest that such possibilities sever completely the logical link between Defendants-Appellees' earlier statements and the "relevant truth" revealed by the abandonment of Tamandua #1 under *Dura*, 544 U.S. at 342-43. While the alleged misrepresentations must do more than merely touch upon the economic loss caused by a corrective disclosure, Defendants-Appellees have identified no authority requiring that a corrective disclosure must squarely and directly contradict the earlier misrepresentations. Indeed, *Lormand*, 565 F.3d at 256 n.20, explicitly establishes a lower standard.[20] The fact that the well site was not commercially viable certainly makes it more probable that Defendants-Appellees' representations in November 2009 and later in 2011 and 2012 were false statements. As a matter of common sense, a well that produced shows of flowable hydrocarbons and oil would be an encouraging signal to investors. The abandonment of such a well would be less probable than the abandonment of a well that produced no shows of flowable hydrocarbons and oil. As our precedent requires, therefore, the fact of the well's abandonment unquestionably "make[s] the existence of the actionable fraud more probable than it would be," had the well site been commercially viable and continued operations.[21] Accordingly, the news of the well's abandonment could serve as a corrective disclosure for the purposes of alleging loss causation.

For these reasons, Plaintiffs-Appellants have sufficiently pled loss causation based on the drop in stock price that occurred after the abandonment

---

[20] *See also id.* ("If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements. And if a complete corrective disclosure were required, defendants could immunize themselves with a protracted series of partial disclosures. Thus, to be corrective, a disclosure need not precisely mirror an earlier misrepresentation." (internal citations, alterations, and quotation marks omitted)).

[21] *See Lormand*, 565 F.3d at 256 n.20.

of Tamandua #1.  The district court therefore erred by dismissing Plaintiffs-Appellants' complaint under 15 U.S.C. § 78u-4(b)(4).

## V.

We now address Defendants-Appellees' arguments regarding alternative grounds for affirming the district court's judgment, which the district court either rejected or declined to consider.  Initially, Defendants-Appellees argue that the district court was wrong to conclude that Plaintiffs-Appellants had alleged misrepresentations with sufficient particularity under 15 U.S.C. § 78u-4(b)(1).  As the district court explained:

> Plaintiffs have specified each statement, the date and place the statements were made, who made them or who signed the relevant SEC-filed document, and explained why they find that the statement was misleading, as required by the PSLRA, 15 U.S.C. § 78u-4(b)(1) by showing what the real situation in the well drilling allegedly was before or at the time each statement was made.

Defendants-Appellees have raised a variety of arguments, however, as to why the district court erred on this question.  We address each of these contentions in turn.

First, with respect to the November 2009 slide presentation, Defendants-Appellees argue that they never explicitly represented that they were using the PRMS definition of "reserves."  While this is true, Plaintiffs-Appellants have nonetheless fulfilled the statutory requirement under 15 U.S.C. § 78u-4(b)(1) to allege "why the statement is misleading" by stating in their complaint that the PRMS creates a definitional system of "common reference" for participants in the international petroleum industry.  The SEC's release confirms that the PRMS is "a widely accepted standard for the management of petroleum resources," which enhances the plausibility of Plaintiffs-Appellants'

allegation.[22]  Of course, whether Defendants-Appellees will ultimately prevail on their argument that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the PRMS" is another matter. That question can only be answered based on the evidence produced during a later stage of this litigation.

Second, Defendants-Appellees argue that the context of the November 2009 slide presentation made clear that Defendants-Appellees had just acquired its interest in the CPO 4 Block.  Accordingly, Defendants-Appellees explain, any investors would have realized from this context that Defendants-Appellees' use of the term, "reserves," could not mean that any production or formation testing had already been carried out on the CPO 4 Block.  However, as explained in the passage from the *Seeking Alpha* article quoted in Plaintiffs-Appellants' complaint, Defendants-Appellees' business partner, SK Energy, had possessed rights to the concession since 2008, a full year earlier.  An investor might therefore have believed, based on the slide presentation, that the reference to "reserves" was based on testing performed by SK Energy prior to Defendants-Appellees' purchase of an interest in the concession—or, for that matter, by the previous holder of the rights to the concession.  As for Defendants-Appellees' contention that "wells aren't drilled in secret" and "if there had been wells drilled . . . you would have told about the wells drilled in the presentation," such an industry-specific and inherently fact-bound proposition cannot be verified on the face of the pleadings.  This argument therefore provides no basis to find Plaintiffs-Appellants' complaint deficient under 15 U.S.C. § 78u-4(b)(1).

Third, Defendants-Appellees point to the disclaimer in their slide presentation, in which Defendants-Appellees purportedly communicated to

---

[22] *See* Modernization of Oil and Gas Reporting, 74 Fed. Reg. at 2160 n.15.

investors that their use of the term, "reserves," did not match the definition used by the SEC for regulatory purposes. In relevant part, the disclaimer appeared as follows:

> The United States Securities and Exchange Commission permits oil and gas companies, in their filings with the SEC, to disclose only proved reserves that a company has demonstrated by actual production or conclusive formation tests to be economically and legally producible under existing economic and operating conditions. We use certain terms in this document, such as non-proven, resource potential, Probable, Possible, Exploration and unrisked resource potential that the SEC's guidelines strictly prohibit us from including in filings with the SEC. These terms include reserves with substantially less certainty, and no discount or other adjustment is included in the presentation of such reserve numbers.

This caveat indeed warns investors that the slide presentation would use certain terms that "the SEC's guidelines strictly prohibit . . . from inclu[sion] in filings with the SEC"—such as "probable" reserves and "possible" reserves.

But the term, "reserves," does not itself fall within this caveat, because the use of this term was not prohibited by the SEC.[23] Nothing in Defendants-Appellees' disclaimer suggests that a term that was *permitted* by the SEC would be given a *different meaning* in the slide presentation. Nor did the caveat suggest that any terms—even those terms that actually were prohibited by the SEC—would be used in a manner that diverged from the common understanding in the industry as allegedly set forth in the PRMS. If Plaintiffs-Appellants are correct that the PRMS term, "reserves," always communicates that some instances of actual production or formation tests have taken place, whether or not accompanied by a modifier such as "proved," "probable," "possible," or "estimated recoverable," there is nothing in the slide presentation

[23] *See id.* at 2167.

21

to warn investors that Defendants-Appellees were using the term in a different way.  Contrary to Defendants-Appellees' argument in this appeal, therefore, the slide presentation's disclaimer does not make it "abundantly clear" that the slide presentation's reference to "1 to 4 billion barrels" of "estimated recoverable reserves" actually should have been understood as "fall[ing] into PRMS's 'resource' category, not reserves."

Finally, with respect to the reports regarding the well drilled at Tamandua #1, Defendants-Appellees argue that the statements characterized by Plaintiffs-Appellants as false under 15 U.S.C. § 78u-4(b)(1) were merely statements of opinion regarding the strength of hydrocarbon "shows" or predictions that the well at Tamandua #1 would be commercially viable. Whether or not Defendants-Appellees are correct, "[f]or securities fraud cases, '[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact.'"[24]  Moreover, according to the complaint's characterization of CW 3's testimony, "neither oil nor flowable hydrocarbons were found in the Tamandua #1 well" and "it was not 'factual' or accurate to represent that the well had exhibited 'oil.'"  These statements by CW 3 directly conflict with Defendants-Appellees' representations during the period from July 2011 until April 2012.  These statements also addressed the objective circumstances at Tamandua #1 during the period when the representations were being made.

---

[24] *Lormand*, 565 F.3d at 248 n.13 (quoting *First Va. Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977)); *see also Reese v. Malone*, 747 F.3d 557, 579 (9th Cir. 2014) ("A statement of belief is a factual misstatement actionable under Section 10(b) if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." (citation and quotation marks omitted)); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 166 (3d Cir. 2008) ("We have explained that for misrepresentations in an opinion or belief to be actionable, plaintiffs must show that the statement was issued without a genuine belief or reasonable basis . . . ." (citation and internal quotation marks omitted)), aff'd sub nom. *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 675 (6th Cir. 2005).

No. 13-20519

Accordingly, these statements do not indicate disagreements between the parties over the validity of an opinion or a prediction.

Whether or not any of these allegations can be proven during later stages of this litigation, therefore, Plaintiffs-Appellants have specifically identified "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" as required under 15 U.S.C. § 78u-4(b)(1). Accordingly, we reject each of Defendants-Appellees' arguments regarding the alleged falsity of their statements in the November 2009 slide presentation and the disclosures about drilling progress at Tamandua #1.

VI.

Defendants-Appellees also make two final arguments that are focused only on the November 2009 slide presentation. First, Defendants-Appellees' argue that the November 2009 statement is covered by the safe harbor for forward-looking statements under 15 U.S.C. § 78u-5. In this regard, and in the absence of any contrary authority, we join the First Circuit,[25] Third Circuit,[26] and Seventh Circuit in concluding that a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."[27]

As indicated by the PRMS definition of "reserves," which is quoted in Plaintiffs-Appellants' complaint, the use of this term implicitly communicates a mixed present/future statement of the sort analyzed by the Seventh Circuit in *Makor Issues*, 513 F.3d at 705. With respect to the relative "confidence in the commercial productibility of the reservoir," the use of the industry-specific

---

[25] *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.").

[26] *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009).

[27] *Makor Issues*, 513 F.3d at 705.

term, "reserve," may be characterized as forward-looking.  The use of standardized modifiers under the PRMS, including "proved," "probable," and even "possible," also communicate predictions about the future likelihood of commercial productibility.  In that sense, the November 2009 slide presentation's use of the apparently non-standardized modifiers, "estimated" and "recoverable," in the phrase, "estimated recoverable reserves," likely also communicated a forward-looking statement regarding the commercial productibility of the CPO 4 Block.  To the extent that Defendants-Appellees have emphasized this aspect of the statement in the November 2009 slide presentation, Defendants-Appellees are correct that the term communicated a forward-looking statement.

In this case, however, Plaintiffs-Appellants do not argue that they were deceived regarding the CPO 4 Block's commercial productibility or any other aspect of the CPO 4 Block's future performance.  On the contrary, Plaintiffs-Appellants allegations of fraud focus on that component of the term, "reserves," communicating information about the geological testing that had already occurred with respect to the hydrocarbon reservoirs on the CPO 4 Block.  The factual issue of whether actual production or formation tests have already taken place in the past is undoubtedly backward-looking.  We therefore hold, in accordance with *Makor Issues*, 513 F.3d at 705, and other similar decisions by the First and Third Circuits,[28] that Defendants-Appellees' use of the term, "reserves," is "not entitled to the safe harbor with respect to the part of the statement that refers to the present."

Finally, Defendants-Appellees argue that even if the November 2009 statement regarding "estimated recoverable reserves of 1 to 4 billion barrels" had been false based on Defendants-Appellees' use of the term, "reserves," then

---

[28] *See Avaya*, 564 F.3d at 255; *Stone & Webster*, 414 F.3d at 213.

"the facts constituting the violation" would shortly thereafter have become publicly known on March 29, 2010—triggering the two-year statute of limitations under 28 U.S.C. § 1658(b)(1). According to Defendants-Appellees, a statement in Defendants-Appellees' Form 10-K, which was filed on March 29, 2010, explained that the oil-and-gas concession contained only 1.2 million barrels of "net proved reserves." This document, in Defendants-Appellees' view, would have alerted investors to the falsity of the November 2009 statement regarding more than a "billion barrels." If so, then the two-year statute of limitations would have run before Plaintiffs-Appellants filed their complaint on April 27, 2012.

However, because "proved" reserves are only a subcategory of "reserves" under the PRMS and SEC regulations, this argument is unpersuasive. As indicated by the SEC's release, both "probable reserves" and "possible reserves" also fall into the broader category of "reserves," and yet are not "proved reserves."[29] Such subcategories of hydrocarbon reservoirs therefore could have been encompassed by the erroneous statement in the November 2009 slide presentation, but would have fallen outside the purported corrective statement regarding "net proved reserves" in Defendants-Appellees' Form 10-K in March 2010. Reading both documents together, an investor could form the opinion that "estimated recoverable reserves of 1 to 4 billion barrels" had been confirmed by geological testing on the CPO 4 Block, although only 1.2 million barrels of this amount had yet demonstrated sufficient commercial productibility to constitute "net proved reserves." Accordingly, Defendants-Appellees' March 2010 disclosure would not have demonstrated the falsity of

---

[29] *See* Modernization of Oil and Gas Reporting, 74 Fed. Reg. at 2160, 2167 ("'[P]robable reserves' are those additional reserves that are less certain to be recovered than proved reserves but which, in sum with proved reserves, are as likely as not to be recovered. . . . [P]ossible reserves include those additional reserves that are less certain to be recovered than probable reserves.").

the statement in November 2009.  The Form 10-K therefore would not have triggered the two-year statute of limitations under 28 U.S.C. § 1658(b)(1).

Similarly, Defendants-Appellees argue based on *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010), that a reasonably diligent plaintiff would have begun to investigate the falsity of Defendants-Appellees' November 2009 statements when the *Seeking Alpha* and *Sharesleuth* articles were published in 2010.  Because more than two years passed between those articles and Plaintiffs-Appellants' filing of their amended complaint in November 2012 to include a claim based on the November 2009 statement, Defendants-Appellees argue that the claim based on the November 2009 statement should be dismissed under the statute of limitations.

The district court was correct to conclude, however, that this argument could not be evaluated on a motion to dismiss under the circumstances of this case.  In *Merck*, 559 U.S. at 653, the Supreme Court concluded that "the limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first."  Although the critical facts regarding this limitations argument may be discovered during later stages of this litigation, the face of Plaintiffs-Appellants' complaint does not present facts that would satisfy either of the Supreme Court's two tests.  It is not clear from the complaint when Plaintiffs-Appellants actually discovered the facts surrounding Defendants-Appellees' allegedly false statement in November 2009, nor is it clear when a reasonably diligent plaintiff would have discovered such facts.  We therefore agree with the district court that the limitations issue cannot be decided at this early stage of the proceedings.

## VII.

For these reasons, we conclude that Plaintiffs-Appellants have sufficiently pled their claims for securities fraud in accordance with 15 U.S.C.

No. 13-20519

§ 78u-4 and § 78u-5.  Accordingly, we need not consider the parties' arguments as to whether the district court abused its discretion by denying Plaintiffs-Appellants' request to amend their complaint.  We therefore REVERSE and REMAND this case for further proceedings in accordance with this opinion.

REVERSED and REMANDED.