BARBARA M. G. LYNN, CHIEF JUDGE
Before the Court is Defendants' Motion to Dismiss the Second Amended Complaint ("SAC"). (ECF No. 67). For the reasons stated below, the Motion is GRANTED .
I. Factual and Procedural Background
Defendant Halliburton Company ("Halliburton") is a public corporation that provides "products and services to the petroleum and energy industries." (SAC ¶ 18, ECF No. 53). Plaintiff Patricia A. Magruder, on behalf of all others who acquired Halliburton's stock between December 8, 2001, and July 22, 2002, filed a class action lawsuit against Halliburton and its former CEO, David Lesar, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. (Id. ¶¶ 1, 21). Specifically, Plaintiffs allege that Defendants misrepresented or omitted material information regarding (1) Halliburton's bribery incident in Nigeria, (2) its liquidity, (3) its asbestos reserves, (4) its asbestos liability *459 insurance, (5) the bankruptcy of Harbison-Walker, and (6) the "Barracuda-Caratinga" project.
Plaintiffs' Amended Complaint was previously dismissed with leave to amend. Magruder v. Halliburton Co. , 2009 WL 854656, at *23 (N.D. Tex. Mar. 31, 2009). Plaintiffs were warned "that should they file a Second Amended Complaint suffering from the same deficiencies," they will not be granted leave to "correct the same infirmities" identified by the Court. Id. Plaintiffs thereafter filed the SAC, and Defendants again moved to dismiss.[1]
II. Legal Standard
A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The pleading standard Rule 8 announces does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. Twombly, 550 U.S. at 570, 127 S.Ct. 1955. The Court must accept all factual allegations as true, but it is not bound to accept as true "a legal conclusion couched as a factual allegation." Id. at 555, 127 S.Ct. 1955. Where the facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief. Iqbal , 556 U.S. at 678, 129 S.Ct. 1937.
To state a claim under Section 10(b), plaintiffs must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. See Dura Pharm., Inc. v. Broudo , 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (citing 15 U.S.C. 78j(b) ). In addition, plaintiffs must meet the heightened pleading requirements under Federal Rue of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2).
To adequately plead a material misrepresentation under the PSLRA, plaintiffs must (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the misrepresentations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading. See Goldstein v. MCI WorldCom , 340 F.3d 238, 245 (5th Cir. 2003).
Liability for omissions requires additional analysis because the usual requirements of the PSLRA do not as easily "fit" omissions as they do misrepresentations. See Magruder , 2009 WL 854656, at *4. To adequately plead a material omission, plaintiffs must "plead the type of facts omitted, the place in which the omissions should have appeared, and the way *460 in which the omitted facts made the representations misleading." U.S. ex rel. Riley v. St. Luke's Episcopal Hosp. , 355 F.3d 370, 381 (5th Cir. 2004). Plaintiffs must "specify the statement that is misleading due to the omission in the same manner as a misrepresentation, i.e., the who, what, when, and where." In re Odyssey Healthcare, Inc. Sec. Litig. , 424 F.Supp.2d 880, 893 (N.D. Tex. 2005). If the misleading nature of the statement is not apparent from the content of the statement and the substance of the omissions, the factual allegations of the complaint must set forth an explanation of why the omission rendered the statement misleading. Id. at 894 ; see also Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc. , 537 F.3d 527, 541 (5th Cir. 2008) ("[I]n other words [the omission] must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."). Finally, plaintiffs must plead with particularity the facts giving rise to a duty[2] to disclose the material information. Shaw Grp., Inc. , 537 F.3d at 541.
To adequately plead scienter, the PSLRA instructs the plaintiffs to "state with particularity facts giving rise to a strong inference" that each defendant acted with "intent to deceive, manipulate, or defraud or [with] severe recklessness." Shaw Grp., Inc. , 537 F.3d at 541 ; Owens v. Jastrow , 789 F.3d 529, 535 (5th Cir. 2015) (citation omitted). Severe recklessness is limited to those "highly unreasonable ... misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care." Jastrow , 789 F.3d at 535 (citation omitted). Scienter must exist at the time the alleged misrepresentation occurred. Budde v. Global Power Equip. Grp., Inc. , 2017 WL 6621540, at *2 (N.D. Tex. Dec. 27, 2017).
To qualify as "strong," the inference of scienter must be "more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." See Tellabs, Inc. v. Makor Issues & Rights, Ltd. , 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). This requires the Court to "engage in a comparative evaluation," weighing "not only inferences urged by [the plaintiffs] ... but also competing inferences rationally drawn from the facts alleged." Id. Conclusory allegations are not sufficient. See Shaw Grp. , 537 F.3d at 538-39 (holding that "general allegations and conclusory statements, such as stating [defendants] knew ... adverse material" cannot support a strong inference of scienter). The Court must "assess all the allegations holistically," not each in isolation. Tellabs, 551 U.S. at 326, 127 S.Ct. 2499.
To adequately plead loss causation, plaintiffs must first identify a corrective disclosure that reveals the falsity of the prior misrepresentation. Budde , 2017 WL 6621540, at *5. They must then allege that stock price declined after this disclosure. Id. The corrective disclosure must reveal the fraud or the falsity of the prior representation. Id. Although the disclosure need not be a direct admission that the prior misrepresentation was false, the disclosure must at least be "relevant to" the prior misrepresentation, i.e., the disclosure "must make the existence of the actionable fraud more probable than it would be without" the disclosure.
*461 Lormand v. US Unwired, Inc. , 565 F.3d 228, 256 n.20 (5th Cir. 2009) ; see also Alaska Elec. Pension Fund v. Flowserve Corp. , 572 F.3d 221, 230 (5th Cir. 2009) ("[A] disclosure need not precisely mirror an earlier misrepresentation.").
III. Section 10(b) Analysis
a. Preliminary Issues
i. Mere Puffery
As a preliminary matter, the Court addresses misrepresentations alleged in the SAC that are not actionable. Generalized, positive statements about a company, such as the company's competitive strengths, experienced management, and future prospects, are immaterial as a matter of law. See Basic Inc., et al., v. Levinson , 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). This is because the market relies on specific facts in determining the price of a security, rather than vague and optimistic statements. See Town of Davie Police Pension Plan v. Pier 1 Imports, Inc. , 273 F.Supp.3d 650 (N.D. Tex. 2017).[3]
The Court previously held that Lesar's statements in Halliburton's December 11, 2001, press release, (SAC ¶ 224), December 14, 2001, press release, (id. ¶ 225), and January 23, 2002 press release regarding Halliburton's 2001 fourth quarter results, (id. ¶ 241), were not actionable because they were mere puffery and did not represent any facts. See, e.g. , Magruder , 2009 WL 854656, at *18-*19 ("Lesar's statement was also devoid of actual 'facts' that are typically digested by the market in evaluating a company's worth, and statements that Halliburton had an 'outstanding year' and that 'our patient investors will be rewarded' are immaterial as a matter of law."). Accordingly, Defendants' Motion to Dismiss is GRANTED WITH PREJUDICE as to any claim based on those statements.
The statements of Lesar and Douglas Foshee, Halliburton's CFO during the class period, regarding the company's liquidity are also not actionable for the same reasons. In a December 8, 2001, New York Times article, Lesar stated that Halliburton had "plenty of liquidity." (SAC ¶ 87). In a January 15, 2002, Wall Street Journal article, Foshee further added that "one of the things that [Halliburton has] right now ... is liquidity" and that Halliburton could "weather virtually any kind of a liquidity shortage that might come [its] way." (Id. ¶ 239). In a January 30, 2002, press release, Lesar stated that Halliburton had "considerable liquidity and strong cash flow." (Id. ¶ 246). Plaintiffs allege that Halliburton did not have as much liquidity as represented by Lesar and Foshee. (Id. ¶ 312). Statements that Halliburton had "plenty of" or "considerable" liquidity are too general and vague to cause a reasonable investor to rely on them.[4] See *462 Pier 1 Imports , 273 F.Supp.3d at 650 ("[H]yperbole that a reasonable investor would not view as significantly changing the general gist of available information ... [is] not material, even if [it was] misleading.").[5] Likewise, Foshee's statement that Halliburton could "weather virtually any kind of a liquidity shortage" is just "corporate cheerleading" that is not actionable. In re Franklin Bank Corp. Sec. Litig. , 782 F.Supp.2d 364, 381 (S.D. Tex. 2011) ; see also Krim v. BancTexas Grp., Inc. , 989 F.2d 1435, 1446 (5th Cir. 1993) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws."); In re Blockbuster Inc. , 2004 WL 884308, at *13 ("[Defendant] was under no duty to cast its business in a pejorative, rather than a positive, light."). Accordingly, Defendants' Motion to Dismiss is GRANTED WITH PREJUDICE as to any claim based on statements regarding Halliburton's liquidity.
ii. Statements Attributed to "Defendants" or "Halliburton"
While a corporate defendant may be liable for the false statements of its officers, to satisfy the PSLRA, the false statements must still be alleged with particularity, and the complaint must therefore identify the individual, to whom statements or omissions are attributable. Barrie v. Intervoice-Brite, Inc. , 397 F.3d 249, 262 (5th Cir. 2005) ; see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc. , 365 F.3d 353, 366 (5th Cir. 2004) (noting that a corporation is deemed to have scienter only if the individual who made the misrepresentation has scienter). A complaint that does not specifically tie an individual to the statements or omissions at issue fails to satisfy the PSLRA's heightened-pleading standard. See Southland , 365 F.3d at 375. Corporate documents that have no stated author, or statements within documents that are not attributed to any individual, may be charged to a corporate officer, but only if specific factual allegations link the officer to the statement at issue. Shaw Grp. , 537 F.3d at 533.
Representations made during the December 10, 2001 teleconference (SAC ¶ 221), January 4, 2002, press release (id. ¶ 236), February 14, 2002, press release (id. ¶ 248), February 22, 2002, press release (id. ¶ 249), June 4, 2002, press release (id. ¶ 276), and July 16, 2002, press release (id. ¶ 308), are either unattributed or attributed only to "Halliburton." For example, Plaintiffs allege that, on December 10, 2001, "Halliburton conducted a teleconference and assured investors that the asbestos verdicts were related to Harbison-Walker, that Halliburton had adequate insurance to cover claims, and that the share price decline was a substantial overreaction." (SAC ¶ 221). Plaintiffs further add that those representations "were misleading because Halliburton knew [certain facts]." (Id. ¶ 222 (emphasis added) ). Such an unattributed statement, and the others noted above, are not actionable, as impermissible group pleading. The pleading must include additional allegations that tie a specific individual to the statements. Allegations that an individual furnished *463 the information for the statement or approved the statement or its making or issuance are sufficient. Shaw Grp. , 537 F.3d at 533.
Accordingly, Defendants' Motion to Dismiss is GRANTED WITHOUT PREJUDICE as to any claim based on those statements.
iii. Nigeria Bribery Incident
Plaintiffs' claim for alleged misrepresentations or omissions related to a bribery by Albert Stanley-the former CEO of Halliburton's former subsidiary-to top-level officials in the Nigerian government is barred by the statute of repose. Halliburton's 2001 10-K included the following statement:
We maintain a system of internal control over financial reporting.... The system includes ... established policies and procedures, including a code of conduct, to foster a strong ethical climate which is communicated throughout the Company.
(SAC ¶ 254e). Plaintiffs allege that the 10-K was misleading because "Halliburton's Code of Business Conduct and Ethics was not, in fact, being enforced or followed in the Company's international operations" as shown by the bribery incident. (Id. ¶ 257j). Plaintiffs also identify several statements by Lesar that were allegedly misleading due to his failure to disclose the bribery incident.[6]
Litigation instituted pursuant to Section 10(b) must be commenced within three years after the alleged violation.[7] See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). This statute of repose "serves as an absolute bar to any claims brought more than three years after accrual, regardless of when a plaintiff discovered or could have discovered that he had a claim." In re Affiliated Computer Servs. , 540 F.Supp.2d at 700. Plaintiffs' alleged misrepresentations and omissions regarding the bribery incident were not pleaded until the SAC, which was filed on April 3, 2012.[8] Accordingly, Defendants' Motion to Dismiss is GRANTED WITH PREJUDICE as to any claim based on statements regarding the bribery by Albert Stanley.
iv. Compensation as Motive
Plaintiffs assert that Lesar and other executives had motive to commit fraud because their compensation was tied to Halliburton's financial performance. (SAC ¶¶ 387-92). However, such allegations "are not the types of motive that support a strong inference of scienter." Abrams v. Baker Hughes Inc. , 292 F.3d 424, 434 (5th Cir. 2002). Incentive compensation "can hardly be the basis for which an allegation of fraud is predicated" because if the Court were to hold otherwise, "the executives of virtually every corporation in the United States would be subject *464 to fraud allegations." Id. Accordingly, the Court will not consider Plaintiffs' allegations regarding financial compensation as supportive of scienter.
v. Preclusion
The SAC alleges that because the Court, prior to severance, had preliminarily certified the class, Defendants in this case are precluded by estoppel and the "law of the case"[9] from contesting the validity of Plaintiffs' claims and the propriety of class certification. (SAC ¶¶ 5-8). Preclusion, whether by estoppel or "law of the case," requires that the issue in question be actually decided. See Lindquist , 669 F.3d at 238-39 ("[T]he law of the case doctrine applies only to issues that were actually decided, rather than all questions in the case that might have been decided, but were not."); Fin. Acquisition Partners LP v. Blackwell , 440 F.3d 278, 284 (5th Cir. 2006). The class was preliminarily certified for the purposes of settlement only, and the Court has never decided that Plaintiffs' allegations were legally sufficient or that class treatment was proper. Accordingly, Defendants are not precluded from contesting the validity of Plaintiffs' claims and the propriety of class certification in this case.
vi. Omissions
The SAC identifies statements that are fraudulent due to material omissions. However, plaintiffs generally fail to allege omissions with particularity as required by the PSLRA. An omission is material only if it alters the meaning of an allegedly misleading statement. Shaw Grp. , 537 F.3d at 541. Accordingly, the relationship between the statement and the omission must be sufficiently clear and addressed with particularity in the complaint. See Southland , 365 F.3d at 375 n.15 ("[T]he factual allegations of the Complaint do not reflect, and it does not otherwise appear, that the omission of these details from the press release rendered it misleading."). The complaint "should specify the inference or implication that allegedly arises from the statement and explain why that inference or implication arises from the statement" and "should specify the omitted information that is contrary to the implication or inference arising from the allegedly misleading statements." In re Odyssey Healthcare , 424 F.Supp.2d at 894.
For all of the alleged omissions, Plaintiffs summarily conclude that a particular statement was "misleading in failing to disclose the following facts which were then existing, known to or recklessly disregarded by defendants to be false, and necessary to be disclosed to make the statements made not misleading." (See, e.g. , SAC ¶ 226). Plaintiffs then basically repeat the same set of omitted facts for each statement, without explaining why the omission rendered the statement misleading or why Defendants had a duty to disclose the omitted fact.
For example, Plaintiffs identify several statements that failed to disclose certain information on the Barracuda-Caratinga project. There does not appear to be any relation between these statements and the omitted facts. (Compare SAC ¶ 219 (comparison to Enron), ¶ 221 (asbestos litigation), ¶ 224 (investment grade rating), ¶ 225 (investment grade rating), ¶ 239 (liquidity), ¶ 240 (investment grade rating and asbestos litigation), ¶ 256 (asbestos litigation) with ¶ 243 ("Barracuda/Caratinga Mega Project was 77 days behind schedule") ). To the extent Plaintiffs suggest *465 that an omission is so significant that any statement not disclosing the omission is misleading, the Court rejects the argument as inconsistent with the particularity requirement of the PSLRA. See also In re Odyssey Healthcare , 424 F.Supp.2d at 895 ("This view would require a defendant to choose between an affirmative duty to disclose everything if anything is said and a vow of silence.").
Overall, there simply is too attenuated a relationship between the allegedly misleading statements and the omissions, and the SAC makes no attempt to bridge this analytical gap. The SAC simply asserts that the statements were misleading and asserts what the omitted information was, without drawing any kind of connection between the two. Given the deficiencies, the Court is also unable to determine whether scienter as to the omissions is properly alleged. Accordingly, Defendants' Motion to Dismiss is GRANTED WITHOUT PREJUDICE as to claims based on omissions.
b. Other Defects in Plaintiffs' Allegations
Plaintiffs' allegations suffer from other defects in addition to the ones identified above. The Court will address them by subject matter.
i. Allegations Regarding Asbestos Liability and Reserves
Plaintiffs fail to state a claim for alleged misrepresentations regarding Halliburton's asbestos reserves. Halliburton's 2001 10-K and the First Quarter 2002 10-Q disclosed the figures for its asbestos reserves. (See SAC ¶¶ 254, 292). The financial statements cautioned that accrued reserves were based on estimates of Halliburton's liability for known, open asbestos claims and that Halliburton had "not accrued reserves for unknown claims that may be asserted against [it] in the future." (Id. ) The statements further noted:
We estimate settlement payments for open claims by applying our average historical settlement costs by type of claim to the corresponding open claims. We believe our average historical settlement costs are a reasonable estimate of the cost of resolving open claims. We estimate the cost of final judgments by reviewing with our legal counsel the probable outcome of pending appeals. If the actual cost of settlements and final judgments differs from our estimates, our reserves for open claims may not be sufficient. If so, any deficiency would be a loss we would be required to recognize at the time it becomes reasonably estimable.
(Id. ¶ 254c).
Plaintiffs allege that "Halliburton, in fact, had not adequately reserved or accounted for its accrued asbestos liabilities as represented" and that Halliburton's liability for asbestos claims exceeded the stated reserves "by a huge multiple." (See SAC ¶¶ 257f, 268g). Plaintiffs further allege that "Halliburton's reserve for its accrued asbestos liabilities had not been objectively measured or determined or subjected to any expert review or consultation and, thus, represented nothing more than a self-interested management's claim, which managements [sic] knew was grossly inadequate." (See ids="2806729" index="64" url="https://cite.case.law/f-supp-2d/424/880/#p893">id. ¶¶ 257g, 268h).
There are no allegations in the SAC of what the allegedly misstated reserves should have been. In re Capstead Mortg. Corp. Sec. Litig. , 258 F.Supp.2d 533, 550 (N.D. Tex. 2003) (holding allegation that defendants "falsely overstated their net income" to be insufficient, and requiring that plaintiff instead allege that "[d]efendants represented that their net income was 'X amount' when in fact its net income was 'Y amount,' and, of course, if the 'Y amount'
*466 alleged is based on information and belief, state with particularity the facts which support that belief"); ABC Arbitrage Pls. Grp. v. Tchuruk , 291 F.3d 336, 350, 352 (5th Cir. 2002). Simply alleging that the reserves amount was off by a "huge multiple" is not sufficient under the PSLRA.
Plaintiffs' allegation that the calculation for its reserves had not been "objectively measured or determined" is also contradicted by the 2001 10-K and the First Quarter 2002 10-Q specifying the steps used to calculate the reserves. This undermines any inference that Lesar stated the reserves with any intent to deceive or with severe recklessness.[10] Simply alleging that "management" knew the reserves to be grossly inadequate is not only improper group pleading, but also insufficient to support a strong inference of scienter. See Magruder , 2009 WL 854656, at *8 ("[G]eneral allegations and conclusory statements, such as stating [defendants] knew ... adverse material cannot support a strong inference of scienter.").
Furthermore, Plaintiffs fail to adequately allege loss causation. As discussed, the 10-K and the 10-Q cautioned that accrued reserves were based on estimates of Halliburton's liability for known, open asbestos claims. Halliburton hired Dr. Rabinowitz to estimate liability for asbestos claims that may be filed in the future, and his results were disclosed in a July 24, 2002, press release and Halliburton's Second Quarter 2002 10-Q, filed on August 13, 2002. (SAC ¶¶ 317-18). The SAC refers to an amendment issued on April 4, 2003, correcting the estimate of future asbestos liability disclosed in the Second Quarter 2002 10-Q. (See id. ¶ 328). Plaintiffs, however, do not allege how the amendment corrected any statements made during the class period, which ended on July 22, 2002. Plaintiffs also do not allege how revised estimates for future asbestos liability corrects any statement regarding liability for known, open claims.[11] See Magruder , 2009 WL 854656, at *11 (noting securities fraud plaintiffs must identify a corrective disclosure that "reveals a previously concealed truth, which causes a decline in the defendant company's stock price"); id. at *15 ("Plaintiffs simply fail to connect the alleged misrepresentations with correlative corrective disclosures during the Class Period. "). Accordingly, Defendants' Motion to Dismiss is GRANTED WITHOUT PREJUDICE as to statements regarding asbestos liability and reserves.
*467 ii. Allegations Regarding Asbestos Liability Insurance
Plaintiffs fail to state a claim for alleged misrepresentations regarding Halliburton's insurance coverage for its asbestos liability. Halliburton's 2001 10-K estimated insurance recoveries for asbestos claims and further noted:
Estimating amounts we will recover from insurance companies for open claims involves making assumptions about the ability of the companies to meet their obligations under our policies. If our estimates of recoveries differ from actual recoveries, we may have uncollectible receivables that we may be required to write-off and we will have reduced amounts of insurance coverage for future claims. Dozens of insurance companies provide our insurance coverage for non-refractory and non-engineering and construction asbestos claims. We believe this reduces our risk associated with the failure of any one insurance company.
(SAC ¶ 254c).[12] In March 14, 2002, after a court ruled that one of Halliburton's insurers, Highlands Insurance Company, was not obligated to provide coverage for nearly 11% of open asbestos claims against Halliburton, Lesar noted that "[t]here is more than $ 2 billion of excess coverage above the Highlands primary coverage."[13] (Id. ¶ 103).
Plaintiffs allege that these statements are false because Halliburton was "in litigation over coverage with approximately half of its insurers," and therefore the insurance recovery amount Halliburton "was using in its financial statement to offset the expected asbestos claim liability was vastly overstated."[14] (SAC ¶¶ 257h, 104). Plaintiffs also highlight that "Halliburton would ultimately recover only about 50%-60% of the face value of the $ 2 billion Lesar continually represented." (Id. ¶ 207).
Again, Plaintiffs neither allege what the misstated insurance recovery amount should have been at the time of disclosure nor provide facts supporting that belief. See In re Capstead Mortg. Corp. , 258 F.Supp.2d at 550. Plaintiffs also fail to allege that the statements were made with the requisite scienter. In fact, the 10-K disclosed that the potential insurance recovery was an estimated amount based on certain assumptions and even noted that if estimates differed from actual recoveries, Halliburton "may have uncollectible receivables that [it] may be required to write-off." (SAC ¶ 254c; see also id. ¶ 292 ("In those instances in which [insurance] agreements are still in negotiation or in litigation, our estimate is based on our expectation of our ultimate recovery from insurance companies.") ). Ongoing litigation with other insurance companies was also disclosed. (Id. ¶ 209). All of this undermines an inference, let alone a strong inference, that the statements were made with the intent to deceive or with severe recklessness.
Although Plaintiffs make conclusory allegations that Lesar "knew ... insurance *468 recoveries would not be at previous percentage levels," (id. ¶ 242i), such allegations lack specificity about the basis of Lesar's knowledge, such as how and when he learned of it. See also Shaw Grp. , 537 F.3d at 538-39. Furthermore, Plaintiffs appear to allege that because Halliburton ultimately recovered only about 50%-60% of the purported $ 2 billion coverage, Lesar had the requisite scienter. Scienter must exist at the time the misrepresentation allegedly occurred, and Plaintiffs allege no particularized facts to indicate that Lesar knew such a limited recovery was expected. See Plotkin v. IP Axess Inc. , 407 F.3d 690, 698 (5th Cir. 2005) ("Plaintiff cannot charge Defendants with intentionally misleading their investors about facts Defendants may have become aware of after making allegedly misleading statements to the public."); see also Schiller v. Physicians Res. Grp., Inc. , 2002 WL 318441, at *10 (N.D. Tex. Feb. 26, 2002), aff'd , 342 F.3d 563 (5th Cir. 2003) (noting that Plaintiff may not merely "seize upon disclosures in later reports and allege they should have been made in earlier ones").
Furthermore, Plaintiffs fail to allege loss causation, not identifying any corrective disclosure and corresponding negative movement in stock price. See also Magruder , 2009 WL 854656, at *11 ; In re Dell Inc., Sec. Litig. , 591 F.Supp.2d 877, 906 (W.D. Tex. 2008) ("Loss causation requires disclosure; defendants in a securities fraud case may not be held liable for a decline in stock price before the fraud is disclosed.").
Accordingly, Defendants' Motion to Dismiss is GRANTED WITHOUT PREJUDICE as to statements regarding asbestos insurance coverage.
c. Allegations Regarding the Harbison-Walker's Bankruptcy
Plaintiffs fail to state a claim for alleged misrepresentations regarding the bankruptcy of Harbison-Walker, a supplier of refractories products and services. Harbison-Walker was formerly a subsidiary of Dresser Industries, but had spun-off in 1992 and had agreed to indemnify Dresser against all costs associated with asbestos claims filed after the spin-off. (SAC ¶ 248). Dresser merged with Halliburton in 1998. (Id. ¶ 271). On February 14, 2002, Harbison-Walker filed for bankruptcy. (Id. ¶ 248).
In a January 4, 2002, press release, Halliburton announced that "there is no basis to the spurious rumor that it [i.e. Halliburton] has filed for bankruptcy or that such a filing is contemplated." (SAC ¶ 246). Plaintiffs allege that the statement is misleading because "Defendants had commenced, contemplated, or discussed with Harbison-Walker and its parent, having Harbison-Walker seek bankruptcy organization." (Id. ¶ 238). Plaintiffs fail to explain how the press release, which discusses rumors regarding Halliburton's supposed bankruptcy, is even relevant to the Harbison-Walker bankruptcy. See Goldstein , 340 F.3d at 245.
Plaintiffs next identify Halliburton's February 14, 2002, and February 22, 2002, press releases disclosing the Harbison-Walker bankruptcy and the stay of asbestos-related claims against Dresser that Harbison-Walker had assumed since the spin-off. (SAC ¶ 248-49). Plaintiffs allege that the statements were misleading by omission because "[b]ankruptcy courts do not in Chapter 11 extend a stay to a nonbankrupt company without some assurance, express or implied, that company is going to provide a benefit" and Halliburton did in fact give assurances that it would ultimately fund the trust that would resolve the claims. (Id. ¶ 250). Notwithstanding the defects in alleging omissions as *469 discussed above, this argument is undercut by the press releases disclosing that Dresser/Halliburton would cooperate with Harbison-Walker's parent in creating the bankruptcy plan and provide various kinds of financing related to the bankruptcy and the trust creation. (Id. ¶ 248; see also id. ¶ 267 (First Quarter 2002 10-Q disclosing that "Dresser Industries Inc. may make a contribution to a trust in order to achieve a confirmed plan") ).
Finally, Plaintiffs point to Halliburton's June 4, 2002, and July 16, 2002, press releases announcing further extensions to the stay of asbestos-related claims due to the bankruptcy. The SAC highlights the failure to disclose information[15] regarding a global settlement for all claims against Dresser and Halliburton. (SAC ¶ 277). These allegations suffer from the same defects in alleging omissions discussed above, such as explaining how the failure to disclose the details of negotiations about a settlement for all Halliburton asbestos claims makes misleading a statement about a stay of claims assumed by Harbison-Walker.
Finally, Plaintiffs do not adequately allege loss causation. Plaintiffs identify the June 4, 2002, and July 16, 2002, press releases as "partial" corrective disclosures, but do not allege how announcing further extensions to the stay of asbestos-related claims arising from the bankruptcy "reveals a previously concealed truth." Magruder , 2009 WL 854656, at *11. As to the June 4, 2002, and July 16, 2002, press releases themselves, which Plaintiffs allege are actionable, they identify no corrective disclosure at all.
Accordingly, Defendants' Motion to Dismiss is GRANTED WITHOUT PREJUDICE as to statements regarding Harbison-Walker's bankruptcy.
i. Allegations Regarding the Barracuda-Caratinga Project
Plaintiffs fail to state a claim for alleged misrepresentations regarding financial losses from the Barracuda-Caratinga project. On July 6, 2000, Halliburton received a $ 2.5 billion, fixed-price contract to develop oil wells in the Barracuda and Caratinga offshore fields in Brazil. (SAC ¶ 49). Plaintiffs allege that Lesar and other officers were aware of cost overruns on the project and failed to promptly disclose these losses until July 22, 2002, where a press release announced a $ 119 million loss on the project. (Id. ¶ 317). Specifically, Plaintiffs allege that Lesar should have disclosed, at various points during the class period, that the project was behind schedule, subject to liquidated penalty damages, had cost overruns that could not be recouped, and was expecting significant losses. (See id. ¶¶ 226, 242, 243, 257, 258, 268, 269).[16] Plaintiffs also allege that the *470 2001 10-K and the First Quarter 2002 10-Q were false because over $ 40 million in the Barracuda-Caratinga project was recorded as "probable recoveries" of unapproved claims in the project when in fact recovery was unlikely. (Id. ¶¶ 258e, 269e).
Even if the SAC contained the proper allegations required for omission, Plaintiffs have failed to adequately plead facts raising a strong inference of scienter, whether for the omissions or the representations. Plaintiffs repeatedly make mere conclusory allegations that Lesar was "well aware" of the "mounting millions of dollars in losses" in the Barracuda-Caratinga project without supporting allegations of when and what exactly he knew. (SAC ¶¶ 94; see also id. ¶ 114 ("[Lesar] knew the cost overruns at every step, knew the cost overruns were losses and knew the anticipated losses."); id. ¶ 116 ("[T]he accounting for the Barracuda/Caratinga Mega Project was affirmatively false or misleading based on facts known to the CEO Lesar.") ). Plaintiffs seemingly allege that Halliburton entered into the Barracuda-Caratinga contract knowing that it would cost significantly more than the contract amount and that there would be no possibility of recovering those losses. The more reasonable and compelling inference to be drawn is that Halliburton entered into an agreement that turned out to be a loss.
Plaintiffs further note that the 10-K and the 10-Q were misleading because, at the time of their release, Lesar knew, but failed to disclose, that the Barracuda-Caratinga project was 77 to 260 days behind schedule, with $ 77 to $ 260 million due in liquidated penalty damages, and had over $ 40 million in cost overruns that could not be reimbursed. (SAC ¶¶ 258d-e, 269d-e). A later disclosure revealed that the liquidated penalty damages were not asserted by the customer and that change orders by the customer and claims for schedule extension were expected to cover any exposure based on the liquidated damages. (ECF No. 68 at App. 100 (Second Quarter 2002 10-Q, filed August 13, 2002) ). Not only does this undermine an inference of scienter, Plaintiffs fail to explain why damages not asserted by the customer should have been preemptively disclosed as a loss.
Plaintiffs further allege that $ 40 million recorded in financial statements as probable recoveries of unapproved claims on the Barracuda-Caratinga project should have been recorded as losses.[17] In support, Plaintiffs note how the customer of the project had refused to pay unapproved claims in a previous, unrelated contract from 1998. (See, e.g. , SAC ¶ 226f). Plaintiffs fail to explain whether and how the claims from this previous project were similar to the unapproved claims in the Barracuda-Caratinga project; the mere fact that a customer refused to pay a claim on one occasion does not plausibly suggest that collection in another instance would be improbable. To the extent Plaintiffs allege accounting fraud, Plaintiffs fail to plead "who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendants'] financial *471 statements, and if incorporated, whether those adjustments were material in light of [the defendants'] overall financial position." Shushany v. Allwaste, Inc. , 992 F.2d 517, 522 (5th Cir. 1993).
Statements by Lesar made three years after the class period, characterizing the Barracuda-Caratinga project as a "strategy error" and vowing to "never pursue [projects] like that again," does not change the Court's conclusion. (SAC ¶ 347). Scienter must exist at the time the misrepresentation occurred, and such allegations of knowledge are tantamount to "fraud by hindsight," which is insufficient under the PSLRA.
Accordingly, Defendants' Motion to Dismiss is GRANTED WITHOUT PREJUDICE as to statements regarding the Barracuda-Caratinga project.
IV. Section 20(a) Analysis
Under Section 20(a), "[e]very person who, directly or indirectly, controls any" corporation that is found "liable under any provision of this chapter ... shall also be liable jointly and severally with" the corporation. 15 U.S.C. § 78t(a). Plaintiffs must therefore establish a primary violation under Section 10(b) before liability arises under Section 20(a) against the officer defendants. See ABC Arbitrage Plaintiffs Group v. Tchuruk , 291 F.3d 336, 348 n.57 (5th Cir. 2002). Because Plaintiffs do not state a claim for violations of Section 10(b), their Section 20(a) claim must also be dismissed.
V. Conclusion
For the reasons stated above, Defendants' Motion is GRANTED . Unless otherwise noted, Plaintiffs' claims are DISMISSED WITHOUT PREJUDICE . Plaintiffs have leave to address the defects identified in this Order by filing an amended complaint on or before June 1, 2018.
SO ORDERED.

This case was severed from a separate class action lawsuit against Halliburton and its officers. See Erica P. John Fund, Inc. v. Halliburton Company , No. 3:02-cv-1152, slip op. at *1 (N.D. Tex. June 3, 2005) ("EPJF Action"). After Defendants' Motion to Dismiss was filed, the parties agreed to stay the case pending the resolution of appeals taken in the EPJF Action. (ECF Nos. 86, 90). After the appeals were decided, the stay was lifted. (ECF Nos. 87, 91). The parties have since advised the Court that the Motion to Dismiss should be decided before further proceedings in the litigation. (ECF No. 92).

"An affirmative duty to disclose arises when (1) a corporate insider trades on confidential information; (2) a corporation has made inaccurate, incomplete or misleading prior disclosures; or (3) a statute or regulation requires disclosure." See Magruder , 2009 WL 854656, at *4.

See also In re Blockbuster Inc. Sec. Litig. , 2004 WL 884308, at *7 (N.D. Tex. Apr. 26, 2004) ("Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts.").

Notwithstanding that these statements are not actionable, Plaintiffs also fail to plead loss causation. According to Plaintiffs, Lesar and Foshee's "previous assurances as to liquidity" were corrected by a July 19, 2002, Wall Street Journal article which detailed Halliburton's creation of a subsidiary to help "increase the company's short-term liquidity." (SAC ¶ 312; see also id. ¶ 42). The information in the article was actually disclosed two months earlier in Halliburton's First Quarter 2002 10-Q, filed on May 8, 2002. (Id. ¶¶ 267(b), 109). The revelation of information already known to the market cannot constitute a corrective disclosure. See Greenberg v. Crossroads Sys., Inc. , 364 F.3d 657, 665-66 (5th Cir. 2004).

See also Gissin v. Endres , 739 F.Supp.2d 488, 511-12 (S.D.N.Y. 2010) (holding that a statement that the defendant company continued to maintain a "strong" balance sheet was puffery); SRM Glob. Fund Ltd. P'ship v. Countrywide Fin. Corp. , 448 F. App'x 116, 117 (2d Cir. 2011) (holding that a statement that the defendant company had "adequate liquidity" was puffery).

January 15, 2002, Wall Street Journal article (SAC ¶ 239), the January 23, 2002, press releases (id. ¶¶ 240-41), the 2001 10-K (id. ¶ 254-55), and the First Quarter 2002 10-Q, (id. ¶¶ 263-67).

The Sarbanes-Oxley Act of 2002 extended the statute of repose to five years. 28 U.S.C.A. § 1658(b)(2). However, the Act only applies to cases filed after its enactment-July 30, 2002-if the claims were not barred as of that date under the prior law. In re Affiliated Computer Servs. Derivative Litig. , 540 F.Supp.2d 695, 700 (N.D. Tex. 2007).

One of the complaints in the EPJF Action had alleged misrepresentations and omissions related to the bribery of Nigerian officials, with the class period encompassing September 29, 1998, to December 7, 2001. See Erica P. John Fund, Inc. , No. 3:02-cv-1152, 3d Am. Compl. ¶¶ 1, 92 (N.D. Tex. May 9, 2005). The SAC relates only to violations arising between December 8, 2001, and July 22, 2002.

The "law of the case" doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." Lindquist v. City of Pasadena, Texas , 669 F.3d 225, 238 (5th Cir. 2012).

Plaintiffs also point to allegations that Lesar knew that using historical estimates of asbestos liability would be misleading because, for example, he knew that "Halliburton had settled the easy cases and now was faced with claims and cases of a very serious nature." (SAC ¶ 96). However, the 10-K noted that "[i]f the actual cost of settlements and final judgments differs from our estimates, [Halliburton's] reserves for open claims may not be sufficient." (Id. ¶ 254c). Given these qualifications disclosed alongside the reserves figures, the Court is not persuaded that the SAC pleads specific facts giving rise to a strong inference of scienter.

Likewise, the Court is not persuaded by Plaintiffs' argument that revising estimates of future asbestos liability is indicative of any intent to deceive investors on estimates based on known, open claims.
Plaintiffs make a related argument regarding a January 23, 2002, press release, in which Lesar stated: "Halliburton has successfully managed asbestos-related liabilities and settled more than 201,000 claims over a 25 year period at an average cost of $ 200." (SAC ¶ 240). Plaintiffs allege that "Lesar's statement of a net cost of $ 200 was based on two factual premises which he knew were no longer valid - the remaining claims would not be small and the insurance recoveries would not be at previous percentage levels." (Id. ¶ 242i). The SAC does not plausibly allege how Lesar's statement about past claims' resolutions is false or misleading due to any facts affecting future liability.

Halliburton's First Quarter 2002 10-Q made similar statements regarding insurance coverage. (See SAC ¶ 292).

Although the press release is not, on its face, attributed to a specific officer, Plaintiffs provide allegations linking that statement from the press release to Lesar. (See SAC ¶ 207 (referring to the "$ 2 billion Lesar continually represented") ).

Plaintiffs also consistently refer to a statement by Foshee that Halliburton's insurance coverage should protect it against 90% of the asbestos claims. (See, e.g. , SAC ¶ 191). Even if false or misleading, this statement was made on September 4, 2001, which is outside the class period. (Id. )

"(a) Halliburton, through its attorneys supervised by Lesar and Cornelison, were negotiating with Asbestos Claimants Committee (ACC) about a global settlement for all claims against Dresser and Halliburton and the cost to have all of those claims placed in the asbestos trust. (b) The ACC had made demands in dollars of what amounts would be necessary to be contributed and those demands exceeded $ 5 billion or more. (c) The ACC made it clear that Halliburton and Dresser would have to supply those funds, as Harbison-Walker's assets were too small and inadequate. (d) The ACC made it clear to Halliburton that its insurance was it problem, that ACC would not accept any assignments of policies and it wanted cash or stock from Halliburton. (e) The ACC made it clear that only if the cash contributed was substantial could they deliver the necessary vote from claimants to get over the 75% required for such a trust." (SAC ¶ 277).

Plaintiffs reference (1) December 8, 2001, New York Times article, (2) December 10, 2001, teleconference, (3) December 11, 2001, press release, (4) December 14, 2001, press release, (5) January 15, 2002, Wall Street Journal article, (6) January 23, 2002, press releases, (7) 2001 10-K, (8) March 14, 2002, press release, (9) First Quarter 2002 10-Q.

Halliburton's accounting process, which was disclosed repeatedly throughout the class period, was that "[c]laims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work, are included in revenue when collection is deemed probable." (SAC ¶ 366). The parties do not dispute the propriety of this method.